McLean, Justice,
 

 delivered the opinion of the court. — This is a suit in chancery, brought to this court, by an appeal from the decree of the circuit court of Rhode Island. The material facts in the case are these :
 

 William Hunter, the defendant in the court below, is the surviving assignee of Archibald and Frederick Crary, who, in June 1809 obtained the benefit of the insolvent law of Rhode Island. One Jacob Smith, as surety on a custom-house bond, had been compelled to pay to the United States, in May 1808, for the Crarys, about $2125. In February 1810, Smith filed his petition for the benefit of the insolvent law, and in August 1811, Hunter and one Littlefield, now deceased, were appointed assignees. On the 3d day of September following, Smith made to them an assignment of his property. Smith and one McGee were sureties for William Peck, as marshal of the Rhode Island district, who became a defaulter to the government, and against whom and his sureties, in August 1811, a judgment was recovered for $13,500. Upon his being afterwards committed to prison, on an
 
 alias
 
 execution, issued in pursuance of this judgment, Smith petitioned the secretary of the treasury for relief; and stated, that he was reduced to poverty, and had assigned all his property under the insolvent law. His insolvency, he alleged, had been accelerated, if not produced, by his J having paid large sums, *as surety, on certain custom-house bonds,
 
 *117
 
 and particularly the above sum for the Crarys. He was discharged by the secretary, on the 17th day of October 1811, on his making a formal assignment of all his effects to the United States. This assignment purports to convey the same property which he had previously assigned. In 1812, the United States imprisoned Peck, the principal, on execution, arid in the month of June, iri the same year, he was discharged by act of congress. In July 1S24, Hunter, as the assignee of the Crarys, obtained from the United States, under their treaty with Spain, the sum of $8158.81. Out of this sum, Smith was entitled to the amount he paid for the Crarys ; and the United States claim the same from Hunter, as assignee, in part satisfaction of their judgment against Smith. Hunter claims this sum in behalf of the creditors of Smith, under his first assignment.
 

 By the original bill, the government rested its claim on the second assignment. This clearly cannot be sustained. Smith, under the insolvent law of Rhode Island, having assigned all his property for the benefit of his creditors, could not, by a subsequent assignment to the United States, affect the first transfer. The government can set up no right, under the second assignment, which might not be claimed by any other creditor. This ground is abandoned by the amended bill, and the claim of the government .is placed on its priority, under the act of congress. By this act, a preference is given to a government debt over all others; and if the debtor be insolvent, such debt must first be satisfied. It is true, as the defendant insists,
 
 t
 
 that the original bill still remains in the record, and forms a part of the case. But the amendment presents a new state of facts, which it was competent for the complainants to do ; and on the hearing, they may rely upon the whole case made in the bill, or may abandon some of the special prayers it contains.
 

 The same right of priority, which belongs to the government, attaches t'> the claim of an individual, who, as surety, has paid money to the govern ment. Under this provision, Smith could claim a preference to other creditors, for the *money he paid as surety for the Crarys; and on his p g right, the priority of the government is asserted. L
 

 The defendant resists this demand, on various grounds. He contends, in the first place, that the doctrine of priority is not applicable in this case. This prerogative of the government can only operate, it is insisted, on a debt due at the time. That it cannot reach a debt which depends upon a future contingency; and such was the claim of the Crarys, under the Spanish treaty. It was not realized until in June 1824, nearly thirteen years after the benefit of the insolvent law had been extended to the claimants. It is also contended, that the first assignment of Smith had relation back, and took effect, from the date of his inventory, which was prior to the judgment obtained against him, by the United States. This being the case, the priority of the government could not attach, it is urged ; for it can only act on a debt, and there was no debt, in this case, as against Smith, until judgment was entered.
 

 The assignment under the insolvent law could only take effect from the time it was made. Until the court, in the exercise of their' judgment, determine that the applicant is entitled to the benefit of the law, and in pursuance of its requisitions, he assigns his property, the proceedings are inchoate, and do not relieve the party. It is the transfer which vests in the assignee the property of the insolvent, for the benefit of his creditors. If,
 
 *118
 
 before the judgment of the court, the petitioner fail to prosecute hi.¿ petition, or discontinue it, his property and person are liable to execution, the same as though he had not applied for the benefit of the law. And if, after the judgment of the court, he fail to assign his property, it will be liable to be taken by his creditors on execution. The property placed upon the inventory of an insolvent, may be protected from execution, while he prosecutes his petition ; but this cannot exclude the claim of a creditor, who obtains a judgment, before the assignment. If this Spanish claim had passed into the hands of the assignee of Smith, and been distributed by him, before the debt of the United States was established, or notice of its existence had been S’iven bim, no controversy could have arisen on the subject. *The J defendant, as assignee, could not have been held responsible, under such circumstances; nor could the creditors who received payment, have been compelled to refund to the government.
 

 If the judgment of the government had not preceded the assignment of Smith, there might have been some ground to question the right of priority which is contended for. But the judgment preceded the assignment, which gave the government an unquestionable right of priority on all the property of Smith. Did not this right extend to the claim on the Crarys? It would seem, that no doubt can exist on this subject. If the right cover any part of the property of the insolvent, it must extend to the whole, until the debt is satisfied. It was proper for Smith to include in his assignment the claim on the Crarys. However remote the probability may have been, at that time, of realizing this demand, still, under the insolvent law, it was an assignable interest. If, at the time of the assignment, this claim was contingent, it is no longer so ; it has been reduced into possession, and is now iu the hands of the representative of the debtor to the government. If, under such circumstances, the priority of the government does not exist, it cannot be said to exist -in any ease. It would be difficult to present a stronger case for the operation of this prerogative.
 

 But it is contended by the defendant below, that if the doctrine of preference or priority be applicable to this case, the United States, by various acts, have waived it. The release of Peck from, imprisonment by the act of congress, under the circumstances of the case, it is urged, was a release of Smith, the surety. This act was passed the 24th of June 1812, and it provided, that before his discharge, Peck, should assign “ all his estate, real and personal, which he may now own or be entitled to, for the use and benefit of the United States.” And it also provided, “that any estate, real or personal, which the said William Peck may hereafter acquire, shall be liable to be taken, in the same manner as if he had not been imprisoned and discharged.” *By the act providing for the relief of persons imprisoned for debt due to the United States, passed June 6th, 1798, the secretary of the treasury is authorized to discharge, in certain cases, and the individual so discharged, it is declared, “ shall not be liable to be imprisoned again for the same debt, but the judgment shall remain good and sufficient in law.” As in the act of 1798, there is an express provision that “the judgment shall remain good,” which is omitted in the act discharging Peek, a doubt has been raised, whether the judgment against him can be further prosecuted. If, by this act, the judgment be released against Peck, as a matter of course, his surety is discharged. This act specially provides, *185]
 
 *119
 
 “ that any estate which Peck may subsequently acquire, shall be liable to be taken, in the game manner as if he had not been imprisoned and discharged.” From this provision, it clearly appears, that the release from imprisonment was the only object of the statute, and a proper construction of it does not release the judgment. If the property of Peck may be taken, “in the same manner as if he had not been imprisoned,” it may be taken under the same judgment.
 

 That the same rules of contract are applicable, where the sovereign is a party, as between individuals, is admitted ; but the right of the sovereign io discharge the debtor from imprisonment, without releasing the debt, is clear. And how can such a release discharge the surety? Does it embarrass his recourse against the principal ? In this case, if Smith had paid the debt to the government, he might have resorted to all the remedies against Peck, which the law allows in any case. The recourse of the government against the property of Peck still remains unimpaired ; consequently, the judgment remains unsatisfied, and no act has been done to the prejudice of the surety. The cases in 2 Dane’s Abr. 155 : 3 Serg.
 
 &
 
 iiawle 465, 466 ; and 2 Dali. 373, were cited, to show that while a defendant is charged in execution, the debt is considered as satisfied ; and that a discharge of one co-debtor is a discharge of all. The imprisonment of a defendant is a means to enforce the payment of the judgment, and is only considered a satisfaction *of it, so far as to suspend all other process. If, by the operation of law, by an escape, or by any other means, without the [*186 assent of the plaintiff, the defendant be released from prison, the judgment still remains in full force against him. The imprisonment of Peck, the principal, was no bar to an execution against the body of his surety. In the case under consideration, Smith had been imprisoned and discharged, before Peck was confined. These proceedings were, all regular, however great the hardship may have been to the surety ; and did not, in any manner, lessen the responsibility of either principal or surety. The authorities read on the argument, going to show a release of the sureties, where the creditor, without their assent, enlarges the time of payment, &c., are not considered as opposed to the doctrines here laid down.
 

 The act of the government, in releasing both the principal and surety from imprisonment, was designed for the benefit of the unfortunate debtors, and no unnecessary obstructions should be opposed to the exercise of so humane a policy. If the discharge of the principal, under such circumstances, should be a release of the debt against the surety, the consequence would- be, that the principal must remain in jail, until the process of the law was exhausted against his surety. This would operate against the liberty of the citizen ; and should be avoided, unless required to secure the public interest. A discharge from prison by operation of law, does not prevent the judgment-creditor from prosecuting his judgment against the estate of the defendant. To this rule, a discharge under the special provisions of a bankrupt law, may form an exception. In the cases under consideration, the defendants were discharged under laws which expressly reserved the right to the government to enforce the judgment against the property of the defendants. In 1 Pet. 573, this court decided, on a full consideration of the case, that a discharge of the principal, under an act of congress, did not release the debt against the surety.
 

 
 *120
 
 By an act of congress of the 24th of May 1824, respecting payments , under the Spanish treaty, it is provided, “that in all *cases where • J the person or persons in whose name, or for whose benefit and interest, the aforesaid awards shall be made, shall be in debt and in arrears to the United States, the secretary of the treasury shall retain the same out of the amount of the aforesaid awards,”
 
 &o.
 
 Under this provision, it is contended, that it was the duty of the secretary to retain the amount of Smith’s demand against the Crarys ; and not having done so, the payment must be considered as an abandonment of the claim. That the secretary must have had notice of Smith’s claim, is insisted on, because it was stated on his schedule which was assigned to the United States ; and also in his petition to the secretary of the treasury, on which he was released from imprisonment. Having a knowledge of this claim of Smith’s against the Crarys, it was in the power of the secretary, under the law, to withhold it, and appropriate it in part discharge of the judgment. The priority which first attached to Smith, and through him to the Crarys, would have enabled the government, without the aid of the other provision, to retain the money. But can the payment of it, under such circumstances, operate as a release to Smith ?
 

 It might be dangerous, to give the same effect to a voluntary payment by an agent of the government, as if made by an individual in his own right. The concerns of the government are so complicated and extensive, that no head of any branch of it can have the same personal knowledge of the details of business, which may be presumed in private affairs. And if, in the case under consideration, some clerk in the treasury department, or even the secretary, did pay to the assignee of the Crarys the amount claimed by Smith, which might, and perhaps ought to have been, retained, is it an abandonment of the claim ? Where an officer of the government is in arrears, his salary is required io be withheld, until the sum in arrears shall be paid. In such a case, the books of the treasury would furnish its officers with notice of the delinquency; and yet, would it be contended, that a payment of the salary, which ought to have been retained, would release the debt ? It cannot be admitted, that an omission of duty of this kind, as a *iqot payment through mistake, by an officer, shall bar *the claim of the J government. If, in violation of his duty, an officer shall, knowingly, or even corruptly, do an act injurious to the public, can it be considered obligatory ? He can only bind the government by acts which come within a just exercise of his official power. The payment to the assignee of the Crarys can in no respect affect the claim now set up against the assignee of Smith.
 

 An objection is urged, on the ground that the United States have failed to prosecute their claim with sufficient diligence, and that it is subject to the imputation of staleness. Until the sum of money in controversy was received by the assignee of Smith, in 1824, the United States could not be charged with a want of diligence in prosecuting their claim against Smith. They had obtained a judgment in 18LI, and there was no property within the reach of any process on that judgment, by which it could be satisfied. To subject the above claim to this judgment, the bill in the present case was filed, in 1824. If, therefore, a want of diligence could in any case be
 
 *121
 
 charged against the government, there is no ground to make the charge in this case.
 

 The last objection urged by the defendant is, that there was full and ample relief to be obtained at law ; and consequently, chancery cannot take jurisdiction of the case. In his capacity as trustee, the government seeks to make Hunter liable ; he bears the same relation to the creditors of Smith. It was proper in him, conceiving as he did, that the fund in his hands should be paid to these creditors, to resist the claim of the government. Until its right of priority, under all the circumstances of the case, was judicially established, he, in the exercise of his discretion, might withhold the payment. The trustee can only be desirous of making the payment, as the law requires. How is this liability to be enforced ? What process at law would be adequate to give the relief prayed for in the bill ? It is the peculiar province of equity, to compel the execution, of trusts. In this case, it is conceived, the proceeding at law would not be adequate; the fund to be reached was in the hands of a trustee ; and it was important that it should not pass from his hands to the creditors of Smith ; the amount of the claim against the Crarys might be ^'disputed; the trustee was entitled to his commissions, and other difficulties were likely to arise, L in the progress of the investigation, which could only be fully adjusted, at the instance of the United States, by a court of chancery. No doubt exists, therefore, that a resort to the equity jurisdiction of the circuit court in this case was proper and necessary. The judgment of the circuit court must be affirmed, but without costs.
 

 This cause came on to be heard, on the transcript of the record from the circuit court of the United States for the district of Rhode Island, and was argued by counsel: On consideration whereof, it is ordered and decreed by this court, that the decree of the said circuit court in this cause be and the same is hereby affirmed, without costs.