# WISCONSIN CENTRAL RAILROAD COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 21. Argued October 15, 16, 1896. — Decided November 16, 1896.

The changes made in the grants to Wisconsin in the act of May 5, 1864, to
    aid in the construction of railroads from those made to that State by
    the act of June 3, 1856, rendered necessary some modifications of pro-
    visos 1 and 3 of § 1, and of §§ 2, 3 and 4 of the latter act, and they were
    accordingly reënacted in homologous provisos and sections of the act
    of 1864; but as the 2d proviso of § 1 and § 5 of the act of 1856 required
    no modification, they were not reënacted, but the terms and conditions
    contained therein were carried forward by reference, as explained in
    detail in the opinion of the court.
Statutes granting privileges or relinquishing rights of the public are to be
    strictly construed against the grantee.
An intention to surrender the right to demand the carriage of mails over
    subsidized railroads at reasonable rates, assumed in construing a statute
    of the United States, is opposed to the established policy of Congress.
The terms and conditions imposed on the grant under which the plaintiff
    in error holds embraced the condition that the mail should be carried at
    such rates as Congress might fix; and § 13 of the act of July 12, 1876,
    was applicable.
The Postmaster General, in directing payment of compensation for mail
    transportation, does not act judicially.
The action of executive officers in matters of account and payment cannot
    be regarded as a conclusive determination, when brought in question in
    a court of justice.
The government is not bound by the act of its officers, making an unau-
    thorized payment, under misconstruction of the law.
Parties receiving moneys, illegally paid by a public officer, are liable *ex æquo
    et bono* to refund them; and there is nothing in this record to take the
    case out of the scope of that principle.
The forms of pleading in the Court of Claims do not require the right to
    recover back moneys so illegally paid to be set up as a counterclaim in
    an action brought by the party receiving them to recover further sums
    from the government.

AN act of Congress of March 3, 1873, c. 231, 17 Stat. 556,
prescribed the rates of compensation for the transportation of
the mails on the basis of the average weight, and by an act

of July 12, 1876, c. 179, 19 Stat. 78, the compensation was directed to be readjusted by the Postmaster General as specified on and after July 1, 1876. Section 13 of this act provided "that railroad companies whose railroad was constructed in whole or in part by a land grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only eighty per centum of the compensation authorized by this act."

By an act approved June 3, 1856, c. 43, 11 Stat. 20, Congress granted to the State of Wisconsin lands to aid in the construction of certain railroads northward and northwestward in said State, ultimately reaching the west end of Lake Superior, the land granted being every alternate odd-numbered section for six sections in width on each side of the roads respectively. Section 5 of this act provided: "That the United States mail shall be transported over said roads, under the direction of the Post Office Department, at such price as Congress may, by law, direct: *Provided*, That until such price is fixed by law, the Postmaster General shall have the power to determine the same." Some or all of the roads contemplated in this act not having been constructed, Congress, by act of May 5, 1864, c. 80, 13 Stat. 66, again granted lands to the State of Wisconsin for three different general lines of railroads, the line covered by section 3 of the act, being the one in controversy. By this act alternate odd-numbered sections for ten sections in width, instead of six, were granted "upon the same terms and conditions as are contained in the act granting lands to said State to aid in the construction of railroads in said State, approved June 3, 1856."

The two acts in parallel columns, the words in each and not in the other being printed in italics, are as follows:

*Act of June 3, 1856.*

*Act of May 5, 1864.*

SEC. 1. [This section grants land to aid in the construction of a railroad from Saint Croix River or Lake to Lake Superior.]

SECTION 1. That there be, and is hereby, granted to the State of Wisconsin for the purpose of aiding in the construction of a railroad from *Madison, or Columbus, by the way of Portage City to the Saint Croix · River or Lake between townships twenty-five and thirty-one, and from thence to the west end of* Lake Superior; *and to Bayfield; and also from Fond du Lac on Lake Winnebago, northerly to the state line,* every alternate section of land designated by odd numbers for *six* sections in width on each side of said roads, *respectively.*

But in case it shall appear that the United States have, when the lines or routes of said roads *are* definitely fixed, sold any sections or parts thereof granted as aforesaid, or that the right of preëmption has attached to the same,

SEC. 2. [This section grants land to aid in the construction of a railroad from Tomah to Saint Croix River or Lake.]

SEC. 3. *And be it further enacted,* That there be, and is hereby, granted to the State of Wisconsin, for the purpose of aiding in the construction of a railroad from

*Portage City, Berlin, Doty's Island, or Fond du Lac, as said State may determine, in a north-western direction, to Bayfield, and thence to Superior, on* Lake Superior, every alternate section of *public* land, designated by odd numbers, for *ten* sections in width on each side of said road, *upon the same terms and conditions as are contained in the act granting lands to said State to aid in the construction of railroads in said State, approved June three, eighteen hundred and fifty-six.* But in case it shall appear that the United States have, when the line or route of said road *is* definitely fixed, sold, *reserved, or otherwise disposed of* any sections or parts thereof, granted as aforesaid, or that the right

*then* it shall be lawful for any agent or agents, *to be* appointed by the governor *of said State,* to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tier of sections above specified, *so* much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of preëmption has attached, as aforesaid, which lands (thus selected in lieu of those sold and to which preëmption has attached as aforesaid, together with the sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid,) shall be held by *the* State *of Wisconsin* for the use and purpose aforesaid:

*Provided,* That the lands to be so located shall in no case be further than *fifteen* miles from the line of *the* roads *in each case, and selected for* and *on account of said roads:*

*Provided further, That the*

of preëmption *or homestead* has attached to the same, *that* it shall be lawful for any agent or agents *of said State,* appointed by the governor *thereof,* to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tier of sections above specified, *as* much *public* land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of preëmption *or homestead* has attached as aforesaid, which lands (thus selected in lieu of those sold and to which *the right of* preëmption *or homestead* has attached as aforesaid, together with sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by *said* State, *or by the company to which she may transfer the same,* for the use and purpose aforesaid: *Provided,* That the lands to be so located shall in no case be further than *twenty* miles from the line of *said* road.

*lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever :*

*And provided further*, That any and all lands reserved to the United States by any act of Congress for the purpose of aiding in any object of internal improvement, or in any manner for any purpose whatsoever, be, and the same are hereby, reserved *to the United States* from the operation of this act, except so far as it may be found necessary to locate the route of *said* railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States.

Sec. 2. *And be it further enacted*, That the sections and parts of sections of land which, *by such grant*, shall remain to the United States, within *six* miles on each side of said roads, shall not be sold for less than double the minimum price of the public lands when sold; nor shall any of

Sec. 6. *And be it further enacted*, That any and all lands reserved to the United States by any act of Congress for the purpose of aiding in any object of internal improvement, or in any manner for any purpose whatsoever, *and all mineral lands* be and the same are hereby reserved *and excluded* from the operation of this act, except so far as it may be found necessary to locate the route of *such* railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States.

Sec. 4. *And be it further enacted*, That the sections and parts of sections of land*s* which shall remain to the United States within *ten* miles on each side of said roads shall not be sold for less than double the minimum price of the public lands when sold; nor shall any of the said *re-*

said lands become subject to private entry until the same have been first offered at public sale at the increased price.

SEC. 3. *And be it further enacted,* That the said lands hereby granted *to said State* shall be subject to the disposal of the *legislature thereof,* for the purposes aforesaid, and no other;

and the said railroads *shall* be and remain public highways for the use of the Government of the United States free from toll or other charge *upon* the transportation of property or troops of the United States.

SEC. 4. *And be it further enacted, That the lands hereby granted to said State shall be disposed of by said State only in manner following, that is to say: that a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of roads, respectively, may be sold; and when the governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of either of said roads are completed, then*

*served* lands become subject to private entry until the same have been first offered at public sale at the increased price.

SEC. 8. *And be it further enacted,* That the said lands hereby granted shall, *when patented as provided in section seven of this act,* be subject to the disposal of the *companies respectively entitled thereto,* for the purposes aforesaid, and no other, and the said railroads be, and *shall* remain public highways for the use of the Government of the United States, free from *all* toll or other charge, *for* the transportation of *any* property or troops of the United States.

SEC. 7. *And be it further enacted, That whenever the companies to which this grant is made, or to which the same may be transferred, shall have completed twenty consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title*

*another like quantity of land hereby granted may be sold; and so from time to time until said roads are completed;*

to said lands to the said company entitled thereto, on each side of the road, so far as the same is completed, and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said road is completed: *Provided, however, That no patents shall issue for any of said lands unless there shall be presented to the Secretary of the Interior a statement, verified on oath or affirmation by the president of said company, and certified by the governor of the State of Wisconsin, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end; which oath shall be taken before a judge of a court of record of the United States.*

*and* if said roads *are* not completed within ten years,

Sec. 9. *And be it further enacted, That* if said road mentioned in the third section aforesaid *is* not completed within ten years *from the time of the passage of this act, as provided herein, no further patents shall be issued to said company for said lands, and* no further sale shall be made,

no further sales shall be

made, and the land unsold shall revert to the United States.

and the lands unsold shall revert to the United States.

SEC. 5. *And be it further enacted, That the time fixed and limited for the completion of said roads in the act aforesaid of June three, eighteen hundred and fifty-six, be, and the same is hereby extended to a period of five years from and after the passage of this act.*

SEC. 5. *And be it further enacted, That the United States mail shall be transported over said roads, under the direction of the Post Office Department, at such price as Congress may, by law, direct: Provided, That until such price is fixed by law, the Postmaster General shall have the power to determine the same.*

The road constructed upon the line indicated in section 3 of the act of 1864 was originally that of two companies, which were afterwards consolidated and became the Wisconsin Central Railroad Company. These roads were constructed by the Phillips and Colby Construction Company, who apparently were to have control and operation of the road until fully equipped and delivered to the railroad company. The time for completion having been extended, portions of said roads were completed, equipped and operated in 1875 and carried mails under the management of the construction company up to some time prior to December 27, 1877, when notice was given of the turning over of the roads to the Wisconsin Central Railroad Company, and from that time the mails have been carried by that company. Commencing in 1875 and

continuing until July, 1879, the Postmaster General allowed and paid for the carriage of the mails the customary rates paid to non-land-grant companies.    Upon the informal opinion of the Assistant Attorney General for the Post Office Department, the Postmaster General issued an order, June 2, 1880, directing that from July 1, 1879, the pay should only be at the rate provided by Congress for land-grant roads, namely, eighty per cent of the full amount.    January 26, 1881, upon a reconsideration, orders were issued recalling the order of June 2, 1880, whereupon the department returned to the earlier practice and paid full rates for the carriage of the mails until January 8, 1884, when Postmaster General Gresham again adopted the construction of June 2, 1880, and applied the same to the compensation of these roads from and after July 1, 1883, and that construction has been applied from thence hitherto, and payment made at the rate of eighty per cent of the amount paid non-land-grant roads.

In addition to reducing the pay for carrying the mails for the current and subsequent years, namely, from July 1, 1883, the Postmaster General restated the account for the carriage of the mails prior to July 1, 1883, both during the period when they were carried by the construction company and during the period from about December, 1877, to July 1, 1883, in which they were carried by the Wisconsin Central Railroad Company and deducted out of moneys which had been earned since July 1, 1883, the excess over the eighty per cent rate which had been paid during the previous years.

Suit was brought in the Court of Claims May 26, 1887, by the Wisconsin Central Railroad Company against the United States to recover an alleged balance due as compensation for carrying the mails.    The Court of Claims allowed the railroad company $6448.80 as being the amount deducted from the claimant's earnings in 1886 and 1887 for payments in excess of the eighty per cent rate made to the construction company while that company was operating the roads, but the Court of Claims held that Postmaster General Gresham's construction was correct, and that the claimant was restricted to the eighty per cent rate, and, therefore, disallowed the

claim for the money withheld against the excess and also the amount of the claim for the period subsequent to July 1, 1883. The sums which had been paid to claimant in excess of the eighty per cent rate and which were deducted from subse-. quently earned pay, amounted to $12,532.43. The twenty per cent subsequent to July 1, 1883, was $16,343.58.

The Court of Claims gave judgment in favor of the Wisconsin Central Railroad Company for $6448.80, and the railroad company appealed. The United States did not appeal.

The opinion of the court, by Nott, J., is reported 27 C. Cl. 440.

*Mr. Louis D. Brandeis* for appellant. *Mr. Edwin II. Abbot, Mr. Howard Morris,* and *Mr. William H. Dunbar* were on his brief.

I. The grant made by the act of 1864 was not upon condition that the mails should be carried at such rates as Congress might fix.

That act contains no express condition for the transportation of the mail, and the circumstances leading to its passage show that Congress did not intend to impose such a condition. The intention of Congress is to be ascertained from the facts attending the passage of the act, as well as from its language. *Winona & St. Peter Railroad* v. *Barney,* 113 U. S. 618; *Wisconsin Central Railroad* v. *Forsythe,* 159 U. S. 46; *Caledonian Railway* v. *North Bristol Railway,* 6 L. R. App. Cas. 114.

The facts show that Congress did not intend to impose this condition. Such an intention is not inconsistent with the policy of Congress. *Union Pacific Railroad* v. *United States,* 104 U. S. 662. This condition was not incorporated by reference in the act of 1864; and an analysis of that act shows that no such incorporation was intended. See *McRoberts* v. *Washburne,* 10 Minnesota, 23. The structure of the act indicates that the words " terms and conditions." did not refer to the provision in the act of June 3, 1856. *Atkins* v. *Disintegrating Co.,* 18 Wall, 272; *In re Cambrian Railways Com-*

*pany's Scheme*, L. R. 3 Ch. App. 278; *Thompson* v. *Farrer*, L. R., 9 Q. B. D. 372; *People* v. *Davenport*, 91 N. Y. 574.

The language used does not require a construction imposing such a condition. If it does, the words in question should be disregarded as inconsistent with the general scope of the act. *Ebbs* v. *Boulnois*, 10 Ch. App. 479; *People* v. *Davenport*, 91 N. Y. 574; *Ross* v. *Barland*, 1 Pet. 655.

The construction contended for by the claimant was adopted by the Post Office Department contemporaneously with the passage of the act of July 12, 1876, c. 179, and should be followed. *United States* v. *Alabama Great Southern Railroad*, 142 U. S. 615.

II. Even if § 13 of the act of July 12, 1876 be held applicable to the Wisconsin Central Railroad, payments made under a different construction of the act of May 5, 1864, cannot now be used to defeat the claim for money confessedly earned.

(*a*) The order of the Postmaster General to withhold this money on account of alleged past overpayments involved a reversal of the decisions of his predecessors. Such reversal was in defiance of the well established rule that the decisions of executive officers involving the construction of a law are final upon the same executive department, not as to the rule of law decided, but as to the decision of the particular case, and hence was illegal. *United States* v. *Bank of the Metropolis*, 15 Pet. 377; *Kendall* v. *Stokes*, 3 How. 87; *Ex parte Randolph*, 2 Brock. 447; *Stotesbury* v. *United States*, 146 U. S. 196; *United States* v. *Stone*, 2 Wall. 525; *Shepley* v. *Cowan*, 91 U. S. 330; *Moore* v. *Robbins*, 96 U. S. 530; *Noble* v. *Union River Logging Railroad*, 147 U. S. 165; *Waddell* v. *United States*, 25 C. Cl. 323; *Armstrong* v. *United States*, 29 C. Cl. 148; *Cotton* v. *United States*, 29 C. Cl. 207.

(*b*) Such alleged overpayments would not even have entitled the government to recover by suit the money paid, because the money was paid, in the main, after a deliberate consideration of the question involved by the Postmaster General, to whom the duty of deciding it was committed, and the accounts with the claimant covering the period in which such overpayments are alleged to have been made had been settled. *Elliott* v.

*Swartwout,* 10 Pet. 137; *Lamborn* v. *County Commissioners,* 97 U. S. 181; *Brisbane* v. *Dacres,* 5 Taunt. 143; *Midland Great Western Railway* v. *Johnson,* 6 H. L. Cas. 798; *Marshall* v. *Collett,* 1 Younge & Col. (Exch.) 232; *Trigge* v. *Lavallée,* 15 Moore P. C. 270; *Clarke* v. *Dutcher,* 9 Cowen, 674; *United States Bank* v. *Daniel,* 12 Pet. 32; *Rogers* v. *Ingham,* 3 Ch. D. 351; *Queen* v. *Lord Commissioners of Treasury,* 16 Q. B. 357; *Wayne County* v. *Randall,* 43 Michigan, 137; *Hearne* v. *Marine Ins. Co.,* 20 Wall. 488; *Griswold* v. *Hazard,* 141 U. S. 260; *Hunt* v. *Rousmanier,* 8 Wheat. 174; 1 Pet. 1; *McArthur* v. *Luce,* 43 Michigan, 435; *Onandaga Supervisors* v. *Briggs,* 2 Denio, 26; *Hillborn* v. *United States,* 27 C. Cl. 547; 163 U. S. 342; *Patterson* v. *United States,* 28 C. Cl. 321; *United States* v. *Barker,* 12 Wheat. 559; *Brent* v. *Bank of Washington,* 10 Pet. 596; *United States Bank* v. *United States,* 2 How. 711; *The Siren,* 7 Wall. 152; *Smoot's case,* 15 Wall. 36; *Cooke* v. *United States,* 91 U. S. 389; *United States* v. *Bostwick,* 94 U. S. 53; *United States* v. *State Bank,* 96 U. S. 30; *McKnight* v. *United States,* 98 U. S. 179; *Badeau* v. *United States,* 130 U. S. 439. In the last case the court say : " but inasmuch as the claimant, if not an officer *de jure,* acted as an officer *de facto,* we are not inclined to hold that he has received money which, *ex æquo et bono,* he ought to return."

(*c*) Even if the government had the right to recover by suit the money so paid, such right could not be availed of in this proceeding, as the government entered a general traverse, and did not file any counter claim. *United States* v. *Burns,* 12 Wall. 246; *Clark* v. *United States,* 95 U. S. 539; *United States* v. *Behan,* 110 U. S. 338; *United States* v. *Carr,* 132 U. S. 644; *United States* v. *Stahl,* 151 U. S. 366.

*Mr. Assistant Attorney General Dodge* for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Appellant contends that it was not subject to the eighty per cent rate, and hence that it is entitled to recover both the

items disallowed by the Court of Claims; and also that, even if this position be untenable, it should not have been charged with amounts which had already been settled and paid under the view that the company was not so restricted, and should have been awarded the sum of $12,532.43 withheld.

The act of 1864 expressly provided that the grant was made upon "the same terms and conditions as are contained in the act granting lands to said State to aid in the construction of railroads in said State, approved June three, eighteen hundred and fifty-six," and that act contained in its fifth section the following: "That the United States mail shall be transported over said roads under the direction of the Post Office Department at such price as Congress may by law direct, provided that until such price is fixed by law, the Postmaster General shall have the power to determine the same."

But it is argued that the "terms and conditions" referred to do not embrace the terms and conditions prescribed by section 5, because the general subject-matter of every other section of the act of 1856 was expressly reënacted, and therefore it must be inferred that Congress intended to express in the act of 1864 all the terms and conditions which were imposed upon the grant thereby made; or that, in any event, the words should be limited to the terms and conditions of section 1 of the act of 1856.

The difficulty is that to hold that all the terms and conditions imposed upon the grant were specifically expressed in the act of 1864 itself would be to render the reference to the act of 1856 meaningless and to eliminate, by interpretation, the words "upon the same terms and conditions as are contained in" that act; and we are of opinion that the explicit language of the statute cannot thus be done away with.

The existence of terms and conditions in the act of 1856 left wholly unmodified by the reënactments of the act of 1864 preclude the argument that the words so used are without meaning; and, moreover, the settled rule is that statutes granting privileges or relinquishing rights of the public are to be strictly construed against the grantee.

Reference to the two acts will show that the changes in the

new grant rendered necessary some modification of the first and third provisos of the first section and of sections 2, 3 and 4 of the act of 1856 (which embody some, but not all, of the terms and conditions), and they were accordingly reënacted in homologous provisos and sections of the act of 1864, but as the second proviso of section 1 and section 5 required no modification they were not reënacted, and the terms and conditions contained therein were carried forward by reference.

Thus for the first proviso of section 1 of the act of 1856, the first proviso of the third section of the act of 1864 was substituted in order to enlarge the fifteen-mile limit to twenty, and section 6 of the act of 1864 was substituted for the third proviso in order to provide for the exclusion of mineral lands from the grant. So the second section of the act of 1856 was reënacted in the fourth section of the act of 1864 to change the six miles on each side of the road to ten; and section 3 of the act of 1856 was reënacted in section 8 of the act of 1864 to provide for the difference between the patenting to the State under the earlier act and the patenting direct to the companies under the last act, while section 4 of the act of 1856 was reproduced in section 7 of the act of 1864 with the alterations rendered necessary, not only by the change in patenting, but by the increased dimensions of the grant. The fact that the provision for the free transportation of troops and property of the United States, contained in section 3 of the first act, appeared substantially unchanged in the eighth section of the last act is of no significance, as the purpose of the reënactment had no relation to that requirement. The second proviso of section 1 and section 5 of the act of 1856 were not reënacted manifestly because no change was required, and the provision of section 3 of the act of 1864 that the grant should be subjected to *the same* terms and conditions as the grant by the act of 1856, dispensed with the necessity of repetition. Giving this operation to the plain language of that provision, as we must, involves no inconsistency in respect of the terms and conditions contained in the provisos and sections which were reënacted, since the reënactment was due to the necessity of modification arising

under the new grant and indicated no intention to withdraw any of the original terms and conditions.

An intention to surrender the right to demand the carriage of the mails over the subsidized roads at reasonable charges would be opposed to the policy established by well-nigh uniform Congressional legislation on the subject, and although there may have been departures from that policy in a few instances, under exceptional circumstances, none of them justify the contention that such departure was intended here.

We think it follows, also, that there is no room for concluding that the words "the same terms and conditions as are contained in" the act of 1856, should be confined to the terms and conditions contained in the first section of that act, or rather in its second proviso, as the first and third provisos were reënacted. The three provisos of the granting section of the act of 1856 did not embody all the terms and conditions imposed on that grant, and as the grant of the act of 1864 was subjected to the same terms and conditions as those of the prior act, and it was as true of the reënacted sections as it was of the reënacted provisos, that they were alike reënacted to adapt the last act to the changes in the extent and manner of the new grant, we regard the suggestion which would restrict the words used to the second proviso and exclude the fifth section as obviously inadmissible.

Nor are we able to concur in the view that the general policy of the act of 1864 was inconsistent with the imposition of the duty of transporting the mails. The argument is that the grant of 1856 was not sufficiently favorable to induce the building of the roads and that, therefore, Congress in 1864 deemed it proper and necessary to make a more favorable grant and did so in part by dispensing with this duty, but this will not do, for the inducements were made greater by adding two-thirds more land, and at the same time it was expressly provided that the increased grant should be subject to the same terms and conditions as the earlier one. We find nothing in the record to give color to the suggestion that in addition to the increase of the grant Congress intended to surrender the rights of the government in respect of mail

transportation. *Wisconsin Central Railroad* v. *United States*, 159 U. S. 46.

Some reliance is placed by appellant on departmental construction, but we may dismiss that contention with the observation that we do not consider the true construction as doubtful, and that the departmental construction referred to was neither contemporaneous nor continuous. *United States* v. *Alabama Southern Railroad*, 142 U. S. 615; *United States* v. *Healey*, 160 U. S. 136.

We agree entirely with the Court of Claims that the terms and conditions imposed on this grant embraced the condition that the mail should be carried at such rates as Congress might fix, and that section 13 of the act of July 12, 1876, c. 179, 19 Stat. 78, was applicable. The item of $16,343.48 was properly disallowed as was also the item of $12,532.43, unless the latter was recoverable by reason of some ground of objection to its extinguishment by the application of the sums unlawfully paid to and received by the company.

And as to that it is insisted that such application cannot be made because it was not competent for the Postmaster General to withhold the moneys, thus paid without authority of law, as the previous directions to make the payments were decisions binding on the department; because the payments were voluntarily made on due consideration and deliberation and the accounts settled; and because no counterclaim was filed.

The Postmaster General in directing payment of compensation for mail transportation, under the statutes providing the rate and basis thereof, does not act judicially, and whatever the conclusiveness of executive acts so far as executive departments are concerned, as a rule of administration, it has long been settled that the action of executive officers in matters of account and payment cannot be regarded as a conclusive determination when brought in question in a court of justice. *United States* v. *Harmon*, 43 Fed. Rep. 560, by Mr. Justice Gray; *S. C.* 147 U. S. 268; *Hunter* v. *United States*, 5 Pet. 173; *United States* v. *Jones*, 8 Pet. 387; *United States* v. *Bank of Metropolis*, 15 Pet. 377.

In the latter case, which was a suit upon negotiable drafts accepted by the Postmaster General (the authority to do so being assumed for the purpose of the case), and which was decided after the passage of the act of July 2, 1836, c. 270, 5 Stat. 80, 83, whose seventeenth section was carried forward as section 4057 of the Revised Statutes, Mr. Justice Wayne, delivering the opinion of the court, discussed the power of a succeeding Postmaster General to revise the action of his predecessor as to credits, as follows:

"The third instruction asked the court to say, among other things, if the credits given by Mr. Barry, were for extra allowances, which the said Postmaster General was not legally authorized to allow, then it was the duty of the present Postmaster General to disallow such items of credit. The successor of Mr. Barry had the same power, and no more, than his predecessor, and the power of the former did not extend to the recall of credits or allowances made by Mr. Barry, if he acted within the scope of official authority given by law to the head of the department. This right in an incumbent of reviewing a predecessor's decisions, extends to mistakes in matters of fact arising from errors in calculation, and to cases of rejected claims, in which material testimony is afterwards discovered and produced. But if a credit has been given, or an allowance made, as these were, by the head of a department, and it is alleged to be an illegal allowance, the judicial tribunals of the country must be resorted to, to construe the law under which the allowance was made, and to settle the rights between the United States and the party to whom the credit was given.

"It is no longer a case between the correctness of one officer's judgment and that of his successor. A third party is interested, and he cannot be deprived of a payment on a credit so given, but by the intervention of a court to pass upon his right. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute, and it may be done by the direction of the incumbent of the department. The act of 2d July, 1836, entitled 'An act to change the organization of the Post Office Department,' is only affirmative of the antecedent right of the government

to sue, and directory to the Postmaster General to cause suits to be brought in the cases mentioned in the seventeenth section of that act. It also excludes him from determining, finally, any case which he may suppose to arise under that section. His duty is to cause a suit to be brought. Additional allowances, the Postmaster General could make under the forty-third section of the act of March 2, 1825 (3 Story, 1985); and we presume it was because allowances were supposed to have been made contrary to that law, that the seventeenth section of the act of 2d July, 1836, was passed. In this last, the extent of the Postmaster General's power in respect to allowances, is too plain to be mistaken.

"We cannot say that either of the sections of the acts of 1825, and 1836, just alluded to, covers the allowances made by Mr. Barry to Reeside. But if the Postmaster General thought they did, and that such a defence could have availed against the rights of the bank to claim these acceptances, as credits in this suit, the same proof which would have justified a recovery in an action by the United States, would have justified the rejection of them as credits when they are claimed as a set off."

The view thus indicated that executive decisions in cases like the present are not binding on the courts has been repeatedly affirmed and steadily adhered to. *Gordon* v. *United States*, 1 C. Cl. 1; *McElrath* v. *United States*, 12 C. Cl. 201; *Duval* v. *United States*, 25 C. Cl. 46; *Steele* v. *United States*, 113 U. S. 128; *United States* v. *Burchard*, 125 U. S. 176; *United States* v. *Stahl*, 151 U. S. 366. And it has been often applied in the instance of the improvident issue of patents: *United States* v. *Stone*, 2 Wall. 525; *United States* v. *Minor*, 114 U. S. 233; *Mullan* v. *United States*, 118 U. S. 271; *Wisconsin Railroad Co.* v. *Forsythe*, 159 U. S. 46.

In *Steele* v. *United States*, the Navy Department in contracting with the claimant for certain work upon vessels, delivered to him certain old materials at the agreed price of $2000, which was considerably less than the true value. In his suit for payment on the contract it was contended that the delivery of these materials to him at an agreed price was

without warrant of law, and that the materials having been disposed of should be accounted for by the claimant at their true value. This contention was sustained, and this court said: "The fact that the account of the appellant was settled by the officers of the Navy Department, by charging him with the value of the old material at $2000, is no bar to the recovery of its real value by the government. The whole transaction was illegal, and appellant is chargeable with knowledge of the fact."

In *United States* v. *Burchard*, the claimant, an engineer officer, retired October 26, 1874, and entitled to half sea pay, was paid from said date up to April 1, 1878, at a higher rate, whereby he received $425 in excess of that allowed by law, his pay at that rate being passed from time to time by both the disbursing officers in the Navy Department and by the accounting officers. After April 1, 1878, he was paid at a lower rate, which this court held to be the legal rate. He brought suit for the difference after 1878, and the government counterclaimed for the $425 paid to him prior to that time. His petition was dismissed, and the court held the government could recover the overpayment for the prior period. Mr. Chief Justice Waite, speaking for the court, observed that in no event was he entitled to more than half sea pay, and that all over that which he got was by a mistake of the accounting officers, and said: "It only remains to consider whether the amount which has thus been paid, or as much thereof as is embraced in the counterclaim, can be recovered back in this action, and we are of the opinion that it can. The action was brought by Burchard to recover a balance claimed to be due on pay account from the date of his retirement. He had been paid according to his present claim until April 1, 1878, and consequently there was nothing to complain of back of that date. But in reality the account had never been closed, and was always open to adjustment. Overpayments made at one time by mistake could be corrected and properly charged against credits coming in afterwards. His pay was fixed by law, and the disbursing officers of the department had no authority to allow him any more.

If they did, it was in violation of the law, and he has no right to keep what he thus obtained. Whether the government can in any case be precluded from reclaiming money which has been paid by its disbursing and accounting officers under a mistake of law, is a question which it is not now necessary to decide any more than it was in *McElrath* v. *United States,* 102 U. S. 426, 441, when it was suggested. This is a case where the disbursing officers, supposing that a retired officer of the navy was entitled to more than it turns out the law allowed, have overpaid him. Certainly under such circumstances the mistake may be corrected."

In *United States* v. *Stahl,* the claimant, a naval officer, upon a difference of opinion as to the law, had been overpaid in the grade then occupied by him, and sued for a deficiency claimed to exist in his previous grade. This court sustained his contention as to the previous grade, and held that he had been entitled in that grade to the increased compensation, but that the excessive payments which had been made to him in the latter grade should be deducted from any sum which might be found due him in the former.

In *Mullan* v. *United States,* a suit to vacate a patent which had been granted for certain coal lands, the court held that the mistake was one of law, but that nevertheless it having been committed and the patent given for lands which the land officers were not authorized to patent, the patent could be annulled by the court. And Mr. Chief Justice Waite said: " It is no doubt true that the actual character of the lands was as well known at the Department of the Interior as it was anywhere else, and that the Secretary approved the lists, not because he was mistaken about the facts, but because he was of opinion that coal lands were not mineral lands within the meaning of the act of 1853, and that they were open to selection by the State; but this does not alter the case. The list was certified without authority of law, and, therefore, by a mistake against which relief in equity may be afforded. As was said in *United States* v. *Stone,* 2 Wall. 525, 535 : 'The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for

land-reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the act of his predecessor. That is a judicial act, and requires the judgment of a court.'"

In *Wisconsin Central Railroad Co.* v. *Forsythe*, which was an action of ejectment to recover certain lands claimed to have been included within its grant, but which defendant insisted were outside of its grant and subject to private entry, this court said: "But further, it is urged that this question of title has been determined in the land department adversely to the claim of the plaintiff. This is doubtless true, but it was so determined, not upon any question of fact, but upon the construction of the law; and such matter, as we have repeatedly held, is not concluded by the decision of the land department."

As a general rule, and on grounds of public policy, the government, cannot be bound by the action of its officers, who must be held to the performance of their duties within the strict limits of their legal authority, where by misconstruction of the law under which they have assumed to act, unauthorized payments are made. *Whiteside* v. *United States*, 93 U. S. 247; *Hawkins* v. *United States*, 96 U. S. 689, and cases before cited. The question is not presented as between the government and its officer, or between the officer and the recipient of such payments, but as between the government and the recipient, and is then a question whether the latter can be allowed to retain the fruits of actions not authorized by law, resulting from an erroneous conclusion by the agent of the government as to the legal effect of the particular statutory law under or in reference to which he is proceeding.

Section 4057 of the Revised Statutes reads: "In all cases where money has been paid out of the funds of the Post Office Department under the pretence that service had been performed therefor, when, in fact, such service has not been performed, or as additional allowance for increased service actually rendered, when the additional allowance exceeds the sum which, according to law, might rightfully have been allowed therefor, and in all other cases where money of the department has been paid to any person in consequence of fraudulent representa-

tions, or by the mistake, collusion or misconduct of any officer or other employé in the postal service, the Postmaster General shall cause suit to be brought to recover such wrong or fraudulent payment or excess, with interest thereon."

Undoubtedly the word "mistake," as used in this section, includes an erroneous conclusion in the construction or application of a statute. And, this being so, as the duty is devolved on the Postmaster General to cause suit to be brought where money has been illegally paid by reason of misconstruction or misapprehension of the applicable law, it follows that he must be regarded as empowered to reconsider prior decisions to determine whether such a mistake has been committed or not. If in his judgment money has been paid without authority of law and he has money of the same claimant in his hands, he is not compelled to pay such money over and sue to recover the illegal payments, but may hold it subject to the decision of the court when the claimant sues. *United States* v. *Carr*, 132 U. S. 644; *Gratiot* v. *United States*, 15 Pet. 336; *Steele* v. *United States, United States* v. *Burchard, United States* v. *Stahl, supra.* And in that way multiplicity of suits and circuity of action are avoided.

It is unnecessary to go into a discussion of the exceptions which may exist between private parties to the rule that moneys paid through mistake of law cannot be recovered back.

This branch of the case was disposed of by the Court of Claims on the authority of *Duval* v. *United States*, 25 C. Cl. 46. It was there held that "the items of the several statements upon which the Sixth Auditor certifies balances due for carrying the mails ordinarily, and in the absence of special circumstances, may be regarded as running accounts, at least while the parties continue the same dealings between themselves; and that money paid in violation of law upon balances certified by the accounting officers generally may be recovered back by counterclaim or otherwise where no peculiar circumstances appear to make such recovery inequitable and unjust." The mistake was, indeed, treated as one of fact, the Post Office officials erroneously assuming through oversight that the

road in question had not been aided by grants of land, but the governing principle in the case before us is the same.

Reference was made to *Barnes* v. *District of Columbia*, 22 C. Cl. 366, 394, wherein it was ruled, Richardson, C. J., delivering the opinion, that " The doctrine that money paid can be recovered back when paid in mistake of fact and not of law does not have so general application to public officers using the funds of the people as to individuals dealing with their own money where nobody but themselves suffer for their ignorance, carelessness, or indiscretion, because in the former case the elements of agency and the authority and duty of officers, and their obligations to the public, of which all persons dealing with them are bound to take notice, are always involved." We concur in these views, and are of opinion that there is nothing on this record to take the case out of the scope of the principle that parties receiving moneys illegally paid by a public officer are liable *ex æquo et bono* to refund them.

The petition sets forth, among other things, that the Postmaster General wrongfully and unlawfully withheld the $12,532.43 out of moneys due petitioner, which was, therefore, entitled to recover the full amount; and to each and every allegation of the petition the government interposed a general traverse. It is now said that a counterclaim or set off should have been pleaded, but the record does not disclose that this objection was raised below, while the findings of fact show that the entire matter was before the court for, and received, adjudication. Moreover, it has been repeatedly held that the forms of pleading in the Court of Claims are not of so strict a character as to require omissions of this kind to be held fatal to the rendition of such judgment as the facts demand. *United States* v. *Burns*, 12 Wall. 246, 254; *Clark* v. *United States*, 95 U. S. 539, 543; *United States* v. *Behan*, 110 U. S. 338, 347; *United States* v. *Carr*, 132 U. S. 644, 650.

*Judgment affirmed.*

MR. JUSTICE PECKHAM dissented on the question of the right of the government to offset the alleged overpayments prior to July 1, 1883.