**NATIONAL RAG & WASTE COMPANY, Inc., and United States Fidelity & Guaranty Company, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 16184.

United States Court of Appeals
Fifth Circuit.

Nov. 2, 1956.

George S. Brown, Albert A. Rosenthal, Birmingham, Ala., Rosenthal & Rosenthal, Birmingham, Ala., of counsel, for appellants.

W. L. Longshore, U. S. Atty., Fred S. Weaver, Asst. U. S. Atty., Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Acknowledging with a candor that is almost beguiling that successful defense to an admitted total breach of a Government supply contract rests wholly upon the extreme technicality of an asserted failure to give written notice of default, the Contractor appeals from adverse jury verdict and judgment.

By this approach, premised on the fact that, " * * * When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals", Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434; Hunter v. United States, 5 Pet. 173, 30 U.S. 173, 8 L.Ed. 86; Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32; Reading Steel Casting Co. v. United States, 268 U.S. 186, 45 S.Ct. 469, 69 L.Ed. 907; S. R. A., Inc., v. State of Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851, an attitude which receives hospitable reception as we attempt to put Sovereign and citizen on substantial parity in litigation, Jones v. Watts, 5 Cir., 142 F.2d 575, 577, 163 A.L.R. 240, certiorari denied 323 U.S. 787, 65 S.Ct. 310, 89 L.Ed. 628; United States v. Maryland Casualty Company, 5 Cir., 235 F.2d 50, 1956 AMC 1822; the Contractor then insists that since the contractor fails against the Government for want of literal, albeit technical, tee crossing, eye dotting, compliance with the contract terms, Sanford & Brooks Co. v. United States, 267 U.S. 455, 45 S.Ct. 341, 69 L.Ed. 734; Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342; United States v. Cunningham, 75 U.S. App.D.C. 95, 125 F.2d 28, equality of sauce for goose and gander compels a denial of recovery to the Government where it has failed in similar literal, punctilious compliance, cf. Williams v. United States, 26 Ct.Cl. 132; Burton Coal Co. v. United States, 60 Ct.Cl. 294, affirmed 273 U.S. 337, 47 S.Ct. 351, 71 L.Ed. 670; King v. United States, 37 Ct. Cl. 428.

Whether these principles present a conflict of policy and whether, as claimed, Conti v. United States, 1 Cir., 158 F.2d 581, stands alone as an unpersuasive exception, we need not determine. For in our view, there was compliance and the notice was timely and adequate.

The two contracts, effective June 1, required delivery by July 31, 1950 of a specified quantity of wiping rags meeting indicated U. S. Navy specifications. No rags were ever delivered. A quantity was prepared for delivery, but rejected by Naval Inspectors on pre-delivery inspection about July 3. Attacking, on the trial, the inspection as arbitrary and capricious, the Contractor now acquiesces in the adverse jury verdict finding the inspection fair and the rags unacceptable.

As early as July 3, the Contractor, in a letter to the Navy requesting an additional 30 days' extension, predicted that all production would be rejected as,

" * * * We feel that it is almost impossible to fill a navy contract with our Southern mixed rags." The disputed Notice of Termination of July 13 could have come as no surprise, for the Navy, replying July 6 to the Contractor's letter of July 3, declined the requested extension and warned that, " * * * any undelivered balance remaining after that date [July 31] will be subject to termination for default in accordance with the provisions of Section 15 of the General Provisions of the contract." Within but a day or two, the Contractor by letter July 10 candidly acknowledged both nonperformance and inability to perform as " * * * we have gone through the 15,000 lbs already prepared and have come to the conclusion that it will take at least six months to fill the two contracts under your specifications."

Accepting this at its face value, the Navy on July 13 sent the Notice of Termination [1] now in controversy pursuant to the terms [2] of the contracts.

1. "Acknowledgment is made of your letter of 10 July 1950 relative to deliveries under contracts * * * [994 B] and * * * [980 B].

"You are hereby advised that all material which has not been delivered and accepted under these contracts as of 31 July 1950, will be terminated for your default pursuant to Section 11 of the General Provisions of contract * * * [994 B] and Section 15 of contract * * * [980 B], without any further notice to you.

"As permitted by said Section 11 and 15, in addition to its other remedies, the Government may purchase in the open market or otherwise obtain material similar to that called for by these contracts, and if the cost to the Government of material so procured exceeds the price fixed for such material under these contracts, you will be held liable for such excess."

2. Contract No. 980 B provided:
"Section 15—Termination for Default
"(a) Whenever the Contractor
"(1) refuses or fails to make deliveries of the articles called for herein within the time specified in this contract, or
"(2) otherwise defaults in the performance of this contract or so fails to make progress in the prosecution of the work hereunder as to endanger perform-

ance of this contract in accordance with its terms and fails to cure such default or failure within a period of 10 days (or such longer period as the contracting officer may allow) after receipt from the contracting officer of a notice specifying the default or failure,

the Government, subject to the provisions of paragraph (a) of the Section [16] * * *, may by a notice in writing to the Contractor terminate the performance of work under this contract in whole or in any part."

"Section 16—Termination at the Option of the Government
"(a) * * * Termination of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. * * *"

Contract No. 944 B:
Substantially the same except that Section 11 expressly requires "written Notice of Default" and make no reference to the Section "Termination at the Option of the Government"; and the term "refuses or" found in Section 15(a) (1) is omitted and reads " * * * (i) if the Contractor fails to perform * * *."

The Contractor insists that the letter of July 13 was not a written Notice of "Default" of "Termination" because, its brief states: "It speaks in futuro and is no more than a threat to terminate if deliveries are not made."

We do not agree. The Notice was timely, sufficient in form, and predicated on adequate facts. First, the contract was in a state of actual default with the Contractor acknowledging that it could not, and would not be able to, comply by the final delivery date. Actual notice of current non-compliance was given at the inspection July 3, but instead of the Government merely extending an additional 10 days to cure the breach (see e. g., Section 15(a) (2) note 2 supra) the Written Notice gave the full balance of the term (July 13 to July 31). Next, the Notice was plain and emphatic as to what it was. It may have been poor grammar to speak in terms of " * * * all material which has not been delivered and accepted under these contracts as of 31 July 1950, will be terminated for your default * * * ", but the specific reference to Sections 11 and 15 made it certain that these were Notices of Termination of the contracts (not the "material") because of a present, impending, and admitted default. If any doubt existed, it was removed by the express and obvious warning that the Government could exercise its contractual privilege to supply the deficiency in final deliveries by open market or other purchases.

Admittedly, in these circumstances, a Notice of Default given August 1 or six months later would have been adequate. To give the Contractor the opportunity of compliance, partial or complete, was an advantage to it which did not vitiate this Notice when its terms so emphatical-

ly told the Contractor: what is produced, accepted and delivered will be paid for; the deficiency, if any, will be procured elsewhere at Contractor's expense for added cost. This was in strict accord with the contracts. It was not a case of all or nothing since the contracts [3] authorized the Government to "terminate the whole or any part of" the contracts.

The failure of performance being undisputed, the notice adequate, and the Government's measure of damage accepted as adequately proved, the Contractor was entitled to neither a jury nor a directed verdict. The judgment for the Government was right and is

Affirmed.

---

3. E. g., Section 11(d), Contract 994 B: "If this contract is terminated * * * the Government * * * may require the Contractor to transfer title and deliver to the Government * * * (i) any completed supplies, and (ii) such partially completed supplies and materials * * * as the Contractor has specifically produced * * *. The Government shall pay to the Contractor

the contract price for completed supplies delivered to and accepted by the Government * * *."

And see Section 16, Contract 980 B, note 2, supra, providing that the Notice shall specify the "extent to which performance * * * shall be terminated, and the date * * * [it] shall become effective * * *."