INHABITANTS OF THE CITY OF BIDDEFORD *vs.* JOSEPH A. BENOIT.

York.     Opinion July 15, 1929.

*Willard & Ford*, for plaintiffs.
*Leroy Haley*, for defendant.

SITTING : WILSON, C. J., PHILBROOK, BARNES, BASSETT, PATTAN-
GALL, JJ.

BASSETT, J. An action of assumpsit for money paid to recover
$1,913.33, the amount of the premium of a bond given by the de-
fendant for the faithful performance of a contract made by the
defendant with the plaintiff to build an addition to its high school
and paid, as alleged, by the plaintiff to the bonding company for
the benefit of the defendant. Plea the general issue. Verdict for the
plaintiff.

The case comes up on exception and general motion.

EXCEPTION.

The plaintiff named in the writ was the Inhabitants of the City
of Biddeford. The contract upon which the bond was given was
alleged to be and was in fact between the defendant and the City of
Biddeford. The defendant requested the presiding Justice to in-
struct the jury that the plaintiff named in the writ was not the
corporation with which the contract was made and that, there
having been a failure to produce evidence of a contract with or by
the plaintiff, the verdict should be for the defendant. To the refusal
so to instruct, the defendant excepted.

The City of Biddeford was incorporated by Chap. 408 of the
Private and Special Laws of 1855, the first section of which act
provided, "The inhabitants of the town of Biddeford, in the County
of York, shall continue to be a body politic and corporate by the
name of the city of Biddeford; and as such shall have, exercise and
enjoy all the rights, immunities, powers, privileges and franchises
and be subject to all the duties and obligations now appertaining
to or incumbent upon the inhabitants or selectmen thereof."

The City of Biddeford had, under the act, the power to sue and be
sued which the inhabitants of the town of Biddeford then had under
the general statutes, R. S., 1840, Chap. 5, Sec. 23, and which towns
now have, R. S., 1916, Chap. 4, Sec. 1.

The Supreme Court of Massachusetts in *City of Lowell* v. *Morse*,
1 Met., 473, held that in actions brought by or against a town, the
town may by immemorial usage be described as "the inhabitants of"
(name of town) ; that in an action brought by a city, the city may

be properly described by its true corporate name "city of Lowell"; and that the city is not obliged to use also the words "the inhabitants of the" before such name. The decision appears to imply that the action would have been properly brought even if these words had also been used.

That court has also held, *Commonwealth* v. *Dedham*, 16 Mass., 141, that a town may, as a party, be correctly described as "the town of Dedham" without the further words "the inhabitants of."

We think that under our usage, which we derived from Massachusetts and have since used, a town may as a party to an action be properly described "the inhabitants of the town of" (name) as it customarily is, or as "the town of" (name), and that a city may as a party to an action be properly described by its exact corporate name only or preceded by the words "inhabitants of the."

The plaintiff, therefore, was correctly described Inhabitants of the City of Biddeford as by its exact corporate name.

The promisee of the contract, under which it was alleged that the payment was made by the plaintiff, was the plaintiff described by its exact corporate name. No question, therefore, of the promise being made to a person or corporation by a wrong name arises in this case. In such cases of wrong name, the principle stated in *City of Lowell* v. *Morse*, supra, may apply; see also 37 Cent. Dig., Sec. 109, page 2507. Since the promise was made to the plaintiff described by its exact corporate name and the name of the plaintiff as a party was legally the same, there was no variance between allegation and proof. The exception was not well taken.

MOTION.

At a joint convention of the city government of Biddeford on October 13, 1924, it was voted that the Board of Aldermen, the Board of Education, the Principal of the High School and the Superintendent of Schools "form a committee for a new annex to the Biddeford High School." The committee was called "Joint Building Committee." On December 8, it was voted that the mayor and fourteen others named be members of this Committee, that the plans presented by a firm of architects be accepted, and that a loan be made to build the annex.

The Committee decided to make contracts for the work under five separate items, one of which was "General Work," and chose two of their number a subcommittee to be called "Finance Committee" and, among its other duties, to execute the contract.

The Joint Building Committee published in the local paper on February 9, 1925, a call for separate proposals for the five items, bidders "giving bond of a surety company satisfactory to the Finance Committee in the sum of 45 per cent of the entire contract price of each item." The proposals were to be opened on March 12.

The defendant, a general contractor, submitted a proposal — there were twelve others — for the General Work "according to plans and specifications made by" the architects for $127,568. He was familiar with giving contract bonds, had read the published notice, and before the proposals were opened applied to the local agent of a surety company for a bond if he was a successful bidder.

On March 12, after the bids were opened, the Joint Building Committee voted to award the contract for the General Work to the defendant for the amount of his bid.

Execution of the written contract had to await the return of the bond from the company's home office. It was delivered by the agent to the defendant on March 17. The defendant did not give then or at any time later to the agent any instruction as to who was to pay for the premium. The agent, without anything being said, charged it to the defendant who took the bond directly to the Committee, and the contract was then executed by the defendant and for the City of Biddeford by the two members of the Finance Committee.

The agent, after he delivered the bond and charged the premium to the defendant, was notified by telephone — he was unable to state definitely the time or circumstances — from the City Clerk's office to send the bill to that office. He therefore made out a bill for the premium against the city, dated March 17, the date the bond was delivered. On April 9, he received a city check for the amount of the premium, dated April 9 and signed by the mayor, and the bill which was enclosed in a regular official jacket or cover dated April 8 and endorsed on the back "High School Annex"; "Schools;" "Correct, C. A. Weed, Supt.:" "Approved, J. W. Robinson, Board of Education;" "A legal and valid claim in proper

form, Henry A. Pratt, Auditor." The agent immediately receipted the bill and returned it to the City Clerk's office.

The records of the Building Committee contain no record of any action of the Committee authorizing the payment of the premium by the city or relieving the defendant from paying it. There was no record of any action of the city government authorizing payment by the city or relieving the defendant of payment. In short, the only record reference to the bond was the entry in the records of the Building Committee that on March 17 the five contracts for the construction of the annex "which were awarded last Thursday were drawn up and signed by the respective contractors and by the Finance Committee. Satisfactory bonds were presented." The only evidence of the course, formal or otherwise, taken for payment of the bill was the cover of the bill and the indorsements thereon and the check signed by the mayor.

The foregoing facts are not controverted. But the defendant claimed that on March 17, before he signed the contract, he said to the Committee that the premium of the bond was not to be paid by him but by the city, that he did not include the amount in his bid, which would have been that much larger if he was to pay the premium, that the architect who was present confirmed what he said, and that the Building Committee so understood and the payment was made by the city because of this understanding.

Whether or not the contract was signed with this understanding was the issue submitted to the jury, and the jury found it was not.

The plaintiff contended that this action for "money paid" was maintainable because the city paid an obligation which the defendant "under the terms of his bond and contract with the city was bound to satisfy"; and that the benefit conferred thereby upon him was sufficient to create an equitable obligation upon which such an action can be based.

That the payment of the premium was in the first instance an obligation of the defendant seems clear.

The bidders were obliged to furnish a satisfactory bond. The defendant obtained one and was in regular course charged with the premium by the agent.

The defendant claimed that the contract not only contained no recital, reference or implication that he undertook to pay the pre-

mium but contained an implication that he was not to pay because a reference to such payment in the specifications was deleted and the deletion appeared in the blue print copies made for the bidders, one of which the defendant had with each of its pages initialed with his initials. The contract expressly provided that all the specifications annexed to the contract and the plans noted therein "are hereby made a part of this contract and the following is an exact enumeration of the same." Then followed "Schedule of Specifications" by sections, the first of which, "Section A," included among other things the "Advertisement" which was a copy of the published notice of February 9 and the "Notice to Bidders." This Notice had items from (1) to (7) inclusive, of which (6) contained the "Form of the Bond." About three lines immediately preceding, between (4) and (6), was an item which had obviously been numbered (5) and was completely blotted out. But the record is silent as to what it was and there is no way to determine whether it referred to the bond or premium or to what not. That it referred to payment of premium is stated in brief of counsel but does not appear from the record.

The advertisement required each bidder to give a bond. The contract incorporated the advertisement. While neither contained any express statement that the defendant was to pay the premium, there was no statement he was not to pay. The ordinary and necessary implication would be that he was to pay for what he must and did furnish.

The payment of the premium was not an obligation which the defendant was bound to satisfy "under the terms of his bond and contract." His obligation to the city under the contract was to furnish a bond. His obligation was satisfied when he delivered such a bond. The bond was of the kind which must be purchased. His indebtedness for the premium or purchase price arose from the purchase and he had been charged with it. The city was not liable for the purchase price. The bond had taken effect and could not be cancelled for nonpayment of the premium. The indebtedness was no more "under the contract" with the city than an indebtedness for gasoline obtained on credit for the purpose of running an automobile to carry a passenger to a certain destination, which the owner had agreed to do, would be under the contract of carriage.

The indebtedness is a consequence of the contract in either case but is not under it.

We have here therefore the case of A paying to B an obligation of C to B for which A is not liable and is under no compulsion to pay.

Upon the evidence, the payment by the city was voluntary. There was no express request of the defendant for payment by the city. Neither was there any evidence to imply such a request. Unless the defendant on the day the contract was signed or at some time between then and April 8, the date of the voucher of the bill, stated he had not and would not pay the premium, the city had no knowledge that he would not and, if he also said that he would not pay because he understood the city would, it was no evidence from which a request could be implied. It might imply a demand but not a request. Payment thereafter by the city would be a voluntary matter.

Until this action was brought October 19, 1926, no demand for repayment by the defendant was made and there is no evidence prior thereto that the city expected to be reimbursed.

It is elemental that the action for money paid is founded on equitable principles and no privity of contract between the parties is required except that resulting from circumstances showing an equitable obligation. 41 C. J., 20, Sec. 17.

The obligation is not contractual, nor, when said to be "implied," is it an implied contract. It is an implication of law. It is quasi contractual. Williston on Contracts, Vol. I, Sec. 3; Keener on Quasi Contracts, page 5.

"In equity and good conscience" are words used descriptive of the obligation upon which the law constructs a promise to make payment in satisfaction. *Dresser* v. *Kronberg*, 108 Me., 424; *Bither* v. *Packard*, 115 Me., 312; *Kelley* v. *Merrill*, 14 Me., 228.

Under what circumstances will this obligation in equity and good conscience arise?

A quasi contractual right may arise against one in consequence of the payment of his obligation by another. Mere voluntary payment of the obligation of another gives no right of action either in law or equity to recover from the debtor the money so paid. 2 R. C. L., 776, Sec. 33; 23 L. R. A., 123, note. That one is benefited

by the payment by another is not alone sufficient to raise an assumpsit against him. *Turner* v. *Egerton*, 19 Am. Dec., 235 (Md.). If the consideration is beneficial to the party sought to be charged and is actually adopted, taken advantage of, or ratified so that it is equivalent to a subsequent promise to repay, assumpsit for money paid lies. 2 R. C. L., Sec. 33, supra; 23 L. R. A., 122, note; 1 Parsons on Contracts, 9th Ed., *472, page 508. The payor must not have made the payment officiously. Keener on Quasi Contracts, 388; *Dunbar* v. *Williams*, 10 Johns. (N. Y.), 249. If the payment made, though made without request, is not regarded in law as having been officiously made, the party so paying is entitled to be reimbursed to the extent that the debt as between the debtor and himself should in equity and good conscience have been paid by the debtor. Keener on Quasi Contracts, page 388. That the defendant did not request the payment to be made should be no objection, as the basis of the recovery, whether at law or in equity, is the unjust enrichment that would result if the defendant were not compelled to reimburse the plaintiff. Keener on Quasi Contracts, page 396. One does not of course act officiously when he acts from some legal compulsion, which is often found to exist in the cases; *Davis* v. *Smith*, 79 Me., 361; *Marsh* v. *Hayford*, 80 Me., 97; *Ticonic Bank* v. *Smiley*, 27 Me., 229; nor when he acts from necessity to preserve his property or discharge his debt; *Edmunds* v. *Wallingford*, 14 Q. B. D., 811; *Johnson* v. *Royal Mail Steam Packet Co.*, 1 L. R., 3 C. P., 38; *Hunt* v. *Amidon*, 40 Am. Dec., 283 (N. Y.); nor when he fulfills a strong moral duty such as supporting those in need or rendering funeral services; *Gilley* v. *Gilley*, 79 Me., 292; *Patterson* v. *Patterson*, 59 N. Y., 574. *Contra*, *Matheny* v. *Chester*, 133 S. W., 754 (Ky.), which decision did not consider whether there was evidence of expectation of recompense but denied recovery upon the ground that the plaintiff was in no way affected by the defendant's contract. One, however, not a party to the defendant's contract to support may be allowed recovery in quasi contract. *Forsyth* v. *Ganson*, 5 Wend., 558; *Rundell* v. *Bentley*, 53 Hun., 272.

The question of recovery for payment of a debt paid without request and under no compulsion arose in equity in *McGhee* v. *Ellis*, 14 Am. Dec., 124 (Ky.), in the case of a purchaser under an exe-

cution sale of property to which the judgment debtor had no title. The purchaser was in equity allowed to recover from the debtor the money so paid in discharge of the execution debt. This conclusion has been followed in other jurisdictions, *Muir* v. *Craig*, 25 Am. Dec., 111 (Ind.) ; *Dunn* v. *Frazier*, 8 Blackf., 432; Note, 14 Am. Dec., 131, although it was doubted in *McGhee* v. *Ellis* and in *Hawkins* v. *Miller*, 26 Ind., 173, that the purchaser could recover in any action at law ; but there would seem to be no objection to allowing an action at law as readily as in equity. Keener on Quasi Contracts, page 396.

Payments must have been made by the payor with the expectation of being recompensed therefor. Keener on Quasi Contracts, page 350.

While in the case of individuals, recovery may be had for money paid under a mistake of fact but not when paid under a mistake of law, payments of public money made by officials under a mistake of law may be recovered. Williston on Contracts, Vol. III, Sec. 1590 and cases cited. As a general rule, and on grounds of public policy, the government can not be bound by the action of its officers who must be held to the performance of their duties within the strict limits of their legal authority, where by misconstruction of the law, under which they have presumed to act, unauthorized payments are made. *Wisconsin R. R.* v. *United States*, 164 U. S., 190, 210. In many of the cases the recipient was himself a public official. But it is the authority of the one or of those who pay, not the capacity, official or otherwise, of the one who is paid, that determines. The capacity of the latter should not make, as it has not in the decisions made, any difference. In *Wisconsin R. R.* v. *United States*, supra, the recipient was a corporation; in *Heath* v. *Albrook*, 98 N. W., 619 (Ia.), it was an individual.

In *Inhabitants of Livermore* v. *Inhabitants of Peru*, 55 Me., 469, this court applied the same rule to a town as to an individual and decided that money voluntarily paid under a mistake of law by the agents of one town to another town could not be recovered. The case has since been cited as an authority in *Coburn* v. *Neal*, 94 Me., 541, which was, however, a case of payment by an individual. Any distinction between public and private money and between the acts of an individual and of agents of the government was not considered.

There are cases in other jurisdictions holding that a voluntary payment by a public official is the same as voluntary payment by an individual.

But the weight of authority and, as it seems to us, sounder principle support the right of recovery of payments of public money, though voluntarily made under a mistake of law; and *Inhabitants of Livermore* v. *Inhabitants of Peru,* supra, so far as it is a decision to the contrary, is overruled.

Numerous cases are collected in *State* v. *Young,* 110 N. W., 296, (Ia.).

In the cases cited, recovery was sought from the payee and not as in the instant case from a debtor whose debt to the payee had by the payment been paid. If the payment here was unauthorized, the agent of the surety company had no right to the money paid and the city would have maintained an action for it; but that would result in circuity of action because the agent could then recover his debt from the defendant. The defendant can not contend that it is inequitable that the direct road to him be taken.

While therefore in the light of the authorities, although upon the evidence in this case the payment of the premium was voluntary and apparently without expectation of reimbursement and the only basis to raise a quasi contractual obligation was the benefit to the defendant from the payment and therefore it is doubtful if this action for money paid, had the plaintiff been an individual, could be maintained, we hold that where the money of a municipal corporation has been paid to discharge the debt of an individual under a mistake of law or under such circumstances that the debtor should, as between him and the corporation, in equity and good conscience repay the corporation, the latter may recover it in an action of money paid.

If in fact the defendant at the time he delivered the bond and signed the contract made the statements about the payment of the premium he said he did and the Building Committee so understood and impliedly assented, the payment by the city would have been proper and the defendant would have had an equitable defense in this equitable action. That was a question of fact. While it would appear from the evidence that the question, whether the defendant or the city should pay the premium, was considered by some of the

Building Committee and one at least of the Finance Committee and the architect was of the opinion that the city should pay, it was debatable whether the matter had its beginning on the day the bond was delivered and the contract signed or at a later date after the execution of the contract was completed. There was evidence to warrant the conclusion of the jury that it was not at the former time.

. The architect had under the contract no authority to determine who should pay the premium. His statements were opinion only.

If the matter of payment first arose after the delivery of the bond and execution of the contract, the Building Committee or Finance Committee or the city government had no right to modify the contract or to relieve the defendant of his obligation to pay for the premium without consideration any more than to modify the contract price of the work. There is no evidence of any consideration. The defendant said he heard nothing more about the matter after it came up until suit was brought. There was no subsequent dispute concerning liability or any allowance on account of the premium.

The defendant became entitled to several thousand dollars for extras. Final payment was not made until March, 1926, when the certificate for final payment was prepared by the architect. The certificate itself was not in evidence. Its terms did not appear. Nor was it in evidence whether, in reckoning the amount finally due, the payment of the premium was taken into consideration. It was not taken up with the defendant. There were none of the elements necessary for a compromise or for an accord and satisfaction. While nothing was shown for which to criticize the motives on the part of the city officials, the payment of the premium was without consideration and legal authority and can be recovered from the defendant whose obligation to pay was discharged.

The mandate must therefore be

*Exception and motion overruled.*