168

KRAFT FOODS COMPANY OF WIS-
CONSIN, a corporation, Plaintiff,
and
The Borden Company, Intervenor,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

The CUDAHY PACKING COMPANY, a
corporation, Plaintiff,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

ARMOUR & COMPANY, a corporation,
and The Berst Corporation, a cor-
poration, Plaintiffs,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

SAFEWAY STORES, Incorporated, a
corporation, Plaintiff,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

H. J. HEINZ COMPANY, a corporation,
Plaintiff,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

L. D. SCHREIBER & CO., Inc.,
Plaintiff,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

UNITED STATES of America,
Plaintiff,

v.

H. J. HEINZ COMPANY, Defendant.

Civ. A. Nos. 2820–2822, 2824, 2827,
2830, 2889.

United States District Court
W. D. Wisconsin.

June 20, 1958.

Motion to Amend Judgments in
Nos. 2820–2822, 2824, 2827, 2830,
Denied Aug. 4, 1958.

Glenn W. Stephens, Madison, Wis., John T. Chadwell, Rudy L. Ruggles, Chicago, Ill., for Kraft Foods Co.

R. M. Stroud, Madison, Wis., Stuart S. Ball, Richard J. Flynn, Chicago, Ill., for Borden Co.

W. Wade Boardman, Madison, Wis., for Cudahy Packing Co. and H. J. Heinz Co.

R. M. Stroud, Madison, Wis., George E. Leonard, Jr., Louis R. Miller, Chicago, Ill., for Armour & Co. and The Berst Corp.

Glenn W. Stephens, Madison, Wis., Richard J. Faletti, Chicago, Ill., for Salem Commodities, Inc.

Glenn W. Stephens, Madison, Wis., Harry E. Smoot, Chicago, Ill., for L. D. Schreiber & Co., Inc.

George Cochran Doub, Asst. Atty. Gen., George E. Rapp, U. S. Atty., Madison, Wis., Marvin C. Taylor, Special Litigation Counsel, Department of Justice, Washington, D. C., for defendants.

STONE, District Judge.

In six of the above-entitled actions consolidated for trial, the plaintiffs seek a summary judgment determining that they are not obligated to make repayment to Commodity Credit Corporation of the sums paid to them by Commodity Credit Corporation in connection with the transactions challenged by the defendant, United States of America. The defendant filed its counterclaim and asks for judgment directing the repayment by plaintiffs to Commodity Credit Corporation of said sums, with interest, upon the ground that the Secretary of Agriculture exceeded his statutory authority when entering into said transactions.

The seventh case, United States of America v. H. J. Heinz Company, Civil No. 2889, involves precisely the same issues of fact and law as those presented by H. J. Heinz Company v. Commodity Credit Corporation, Civil No. 2827, one of the declaratory judgment actions listed above. It was transferred to this court by the United States District Court for the Eastern District of Pennsylvania, pursuant to Title 28 U.S.C.A. § 1404(a).

Plaintiffs, Kraft Foods Company of Wisconsin, The Borden Company, The Cudahy Packing Company, Armour & Company, The Berst Corporation, Safeway Stores, Inc., and L. D. Schreiber &

Co., are manufacturers of cheese, and, in addition, purchase for resale cheese manufactured by others. Cudahy, Armour, and Safeway also manufacture and purchase butter for resale. H. J. Heinz Company purchases and stores substantial quantities of cheese which it uses in the manufacture of other products.

The defendant, Commodity Credit Corporation (hereinafter called "CCC"), is a federally chartered corporation which functions as an agency of the United States, within the Department of Agriculture, under the Commodity Credit Corporation Act, 15 U.S.C.A. § 714.

This Court has jurisdiction of these actions under the provisions of Title 28 U.S.C.A. § 2201, and 15 U.S.C.A. § 714b(c).

It was conceded at the outset of the trial that the plaintiffs acted in good faith in reliance upon the official announcements of the U. S. Department of Agriculture, made in carrying out the milk price program, and that the Government officials of the Department of Agriculture and CCC also were acting in good faith in promulgating the Da–112 program.

The major issue in these cases is whether the challenged transactions were authorized by the Statutes.

Congress has by Statute, Title 7 U.S.C.A. Ch. 35, empowered the Secretary of Agriculture to support the prices of milk and butterfat, and their products, through loans and through purchases of cheese and butter by CCC.

A recital of the history of the legislation relating to support of agricultural products is fully covered in the opinion of Judge Thomsen in United States v. Swift & Co., D.C., 152 F.Supp. 738, a case involving precisely the same issues of fact and law as those presented in these actions, and needs no repetition here, other than to say that by the Agricultural Act of 1949, 7 U.S.C.A. § 1421, the Statutes involved in these proceedings, Congress specified the premissible methods and levels of the price support of milk, butterfat, and dairy products manufactured therefrom, available under the support program.

Sec. 1421(b) of Title 7 U.S.C.A. provides that, except as otherwise specified, "the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary."

Sec. 1429 provides that "determinations made by the Secretary under this Act shall be final and conclusive; Provided, That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act."

Sec. 1446 provides that the Secretary is authorized and directed to make available price support to producers for milk, butterfat, and the products of milk and butterfat as follows: "* * * (c) The price of whole milk, butterfat, and the products of such commodities, respectively, shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to *assure an adequate supply*. Such price support shall be provided through loans on, or purchases of, milk and the products of milk and butterfat."

Sec. 1426 of the Act directs the Secretary to announce the level of price support for agricultural commodities in advance of the beginning of the marketing year or season, but the level of price support so announced shall not exceed the estimated maximum level of price support specified in this Act, based upon the latest information and statistics available to the Secretary when such level of price support is announced; and the level of price support so announced shall not be reduced if the maximum level of price support when determined is less than the level so announced.

Sec. 1427 of the Act provides that the CCC may sell any farm commodity owned or controlled by it at any price not prohibited by this section. In determining sales policies for basic argicultural commodities or storable nonbasic commodities, the Corporation should give consid-

eration to the establishing of such policies with respect to prices, terms, and conditions as it determines will not discourage or deter manufacturers, processors, and dealers from acquiring and carrying normal inventories of the commodity of the current crop. The Corporation shall not sell any basic agricultural commodity or storable nonbasic commodity at less than 5 per centum above the current support price for such commodity, plus reasonable carrying charges. The foregoing restrictions shall not apply to (D) sales of commodities which have substantially deteriorated in quality or as to which there is a danger of loss or waste through deterioration or spoilage.

Sec. 1428 provides in part as follows:

"(a) A commodity shall be considered storable upon determination by the Secretary that, in normal trade practice, it is stored for substantial periods of time and that it can be stored under the price-support program without excessive loss through deterioration or spoilage or without excessive cost for storage for such periods as will permit its disposition without substantial impairment of the effectiveness of the price-support program. * * *

"(c) A 'basic agricultural commodity' shall mean corn, cotton, peanuts, rice, tobacco, and wheat, respectively.

"(d) A 'nonbasic agricultural commodity' shall mean any agricultural commodity other than a basic agricultural commodity.

"(e) The 'supply percentage' as to any commodity shall be the percentage which the estimated total supply is of the normal supply as determined by the Secretary from the latest available statistics of the Department of Agriculture as of the beginning of the marketing year for the commodity. * * *

"(i) 'Marketing year' for any nonbasic agricultural commodity means any period determined by the Secretary during which substantially all of a crop or production of such commodity is normally marketed by the producers thereof."

Sec. 1431 provides: "In order to prevent the waste of food commodities acquired through price support operations which are found to be in danger of loss through deterioration or spoilage before they can be disposed of in normal domestic channels without impairment of the price support program, the Secretary of Agriculture and the Commodity Credit Corporation are authorized, upon application by the Munitions Board or any other Federal agency and on such terms and under such regulations as may be deemed in the public interest, to make such commodities available to any such agency for use in making payment for commodities not produced in the United States. Any such commodities which are not disposed of pursuant to the foregoing sentence may be made available by the Secretary and the Commodity Credit Corporation at the point of storage at no cost, save handling and transportation costs incurred in making delivery from the point of storage, as follows in the order of priority set forth: First, to school-lunch programs; and to the Bureau of Indian Affairs and Federal, State, and local public welfare organizations for the assistance of needy Indians and other needy persons; second, to private welfare organizations for the assistance of needy persons within the United States; third, to private welfare organizations for the assistance of needy persons outside the United States."

The Agricultural Act of 1949 did not re-enact the wording of the Agricultural Act of 1948, which authorized support of agricultural commodities "through loans, purchases, payments, and *other operations*." "Payments" as a method of support were rejected as to all commodities. "Other operations" were retained as a method in case of basic commodities, and as to wool, tung nuts, honey and Irish potatoes, but were not authorized as to milk and butterfat. Sec. 1446(c).

"Payments" and "other operations" are not authorized by the Act, which requires

the Secretary to first determine what level of support is necessary to assure an adequate supply of milk and butterfat, and the products of such commodities; what products of milk and butterfat CCC shall purchase or make loans on, and what grades and sizes of such products shall be accepted, and he then must translate the milk and butterfat support level into a dollars and cents purchase price (or loan value) for the products of milk and butterfat he decides to accept.

Under the Act, the Department of Agriculture established policies and made certain administrative determinations to implement the outlined program permitted by the Statute. Those policies were embodied in Docket RCP 98a, which covered the marketing year April 1, 1950, to March 31, 1951, as well as a prior interim period. Except for minor changes, those policies continued in force up to and including Docket UCP–98a, which covered the marketing year 1953–1954.

The price which CCC was authorized to pay for such products of milk and butterfat that the Secretary decided to include in the program were fixed at figures which, in the Secretary's judgment, would enable the manufacturer of the product to make and sell them at a reasonable profit after paying the farmer-producer the desired price for his milk or butterfat. The only products selected are cheese, butter, and non-fat dry milk solids. Butter and cheese are the only products involved in these actions.

The announcements of the purchase program for the marketing year 1953–54, Da–99 for butter, and Da–100 for cheese, stated that CCC would purchase the selected products at their respective support prices, provided they met specific requirements as to type, size, grade, and packaging. Cheese was acceptable only in certain large sizes (Cheddars, flats, twins and rindless blocks) weighing from 20 to 70 pounds. The cheese and butter had to be offered in car lots or storage lots.

Grading certificates disclosing that the offered goods met all specifications as to type, grade, size, weight, and packaging had to accompany the offer. Cheese might be offered on either a "standard moisture basis" or on a "dry basis". Dry basis prices were higher than standard moisture basis prices. Physical delivery was effected shortly after CCC's acceptance of the offer, sometimes by delivery to CCC's warehouse, which might be a designated portion of the offerer's warehouse, sometimes by delivery to a vendee or donee of CCC. Payment by CCC was often delayed for several weeks to permit checking, auditing and clearance of the transaction.

The term "handler" as used in the trade and by Agriculture means a concern which buys and sells cheese, butter, or nonfat dry milk solids at wholesale. The Department intended the term "manufacturer and handler" as used in its dockets to be all inclusive and as being the same as "anyone". CCC buys from anyone handling dairy products in carload lots and otherwise complying with its announced terms.

CCC was ready at all times to buy, throughout the entire marketing year, at the support price announced at the beginning of the year, all butter and cheese meeting its specifications.

Dairy products acquired by CCC under the support program are offered for sale back to the commercial market at prices above the current purchase prices, to encourage normal commercial storage of supplies from the spring and summer heavy producing months to the winter period of low production. Whenever the commodities acquired by CCC under the program exceeds the quantities that can be returned to the market, the products are made available for the other uses permitted by the Act.

Milk and butterfat and the products thereof were declared to be "non-storable", and, therefore, not subject to the resale price restrictions which Sec. 1427 placed on sales by CCC of "basic" and "storable nonbasic" agricultural commodities. Offers to buy from CCC had to be in carload lots, and specific as to storage lot designation, location, and prices. The offer had to be accompanied

by a check offered in payment for the commodity. CCC would resell to offerer the identical cheese or butter which the offerer had previously sold to CCC, provided CCC still owned it. If CCC had disposed of the requested goods before receipt of the offer, it could offer a similar product, which was subject to acceptance within one business day. If sale was completed, delivery was usually made several weeks after acceptance of the offer.

The price support purchases of dairy products were equivalent to 2.5% of the total milk supply from March 1949 until March 1951. Only small purchases were necessary in 1951–1952, and in the first nine months of the 1952–53 marketing year.

About one-half of the butter and a substantial quantity of the cheese acquired under the program were sold back to the domestic market. The rest was disposed of through school-lunch and domestic programs, and donations or sales at reduced prices for foreign welfare uses.

During the marketing year of 1952–1953 total price support purchases were equivalent to about 3.5% of the total farm marketings of milk and butterfat.

During the marketing year 1953–1954 the industry was developing a large supply of milk, butterfat, and their products, and it was evident to all in the industry that the support levels for 1954–1955 marketing year would probably be substantially decreased. Months prior to April 1, 1954, the industry took steps to protect itself from the drop in prices which it knew would undoubtedly follow. Their inventories were reduced by sales to CCC. Production was changed from small styles to large size Cheddars, for sale to CCC. Under Da–100, the announcement in force at that time, the offerer could not sell to CCC the small style Cheddar cheeses, made for sale to the trade.

From December 1953, prices received by the farmers for milk began to fall. From December 1953, to January 1954, the price fell 3¢ per hundredweight; from January to February there was an additional drop in price of 9¢ per hundredweight.

The price paid for manufacturing milk is fixed by the purchaser twice a month, covering deliveries during the past half month. The cheese factory determines the price it pays farmers for milk on the basis of what it can obtain for the cheese it manufactures. Cheese must be 10 days old before it can be properly inspected and graded. Notwithstanding the fact that the market price of butter and cheese was falling, the dairies and manufacturers endeavored to keep up the price paid to farmers for milk, since the creameries and manufacturers were protected against loss in that they could sell to CCC their surplus production of butter and cheese that passed inspection.

In March 1953, CCC was required to purchase 45,527,000 pounds of cheese as contrasted with purchases of only 29,-709,000 pounds during the preceding 11 months. During the first 10 months of 1953–1954, CCC purchased 214,000,000 pounds of cheese. By February 1, 1954, CCC was holding 277,000,000 pounds of cheese and 265,000,000 pounds of butter, a net inventory increase in 10 months of approximately 202,000,000 pounds of cheese and 142,000,000 pounds of butter.

The Department may sell dairy products at any price, but as a practice and policy had fixed its selling price for cheese at 2¢ per pound, and butter 3¢ higher than its purchase price for these products.

The Department usually announced its sales prices for each month at the beginning of that month, or near the end of the preceding month.

On February 15, 1954, the Secretary announced that the prices of milk and butterfat would be supported during the forthcoming marketing year, beginning April 1, 1954, at 75% of parity. On February 18, 1954, the actual dollars and cents purchase price for the 1954–1955 marketing year was announced to be 57½¢ per pound for butter (a decrease of 8¼¢ per pound) and 32½¢ per pound for cheese (a decrease of 4¾¢ per pound).

On March 4, 1954, the Secretary of Agriculture announced that during the 1954–1955 marketing year he would sell cheese at 2¢ and butter at 3¢ above the purchase price; also, that during the remainder of March sellers might offer cheese and butter to CCC and simultaneously contract with CCC to repurchase those products during April; also, all cheese produced in March would be eligible if offered prior to March 31, even though grading and inspection had not been completed. On March 9, 1954, he announced the modifying of the 1953–1954 support-program by eliminating inspection certificates. This was embodied in Announcement Da–112, which was issued on March 9, 1954.

On March 9, 1954, Da–100 was modified to permit grade certification in April of cheese offered in March. This was done in anticipation of a large offering during March 1954, which would put a heavy burden on the inspectors. It permitted cheese manufactured during the last 10 days in March 1954 to be offered in March and inspected and graded in April.

Docket No. EXHIBIT Announcement
UCP–98a A Da–112

United States Department of Agriculture
Commodity Stabilization Service
Livestock and Dairy Division
Washington 25, D. C.

March 9, 1954

Purchase and Resale of Salted Creamery Butter, Cheddar Cheese (Cheddars, Flats, Twins and Rindless Block) and Nonfat Dry Milk Solids

The United States Department of Agriculture (hereinafter referred to as USDA) hereby announces that for the remainder of the month of March, it is prepared through the Commodity Credit Corporation (hereinafter referred to as CCC), to purchase Salted Creamery Butter (hereinafter referred to as Butter), American Cheddar Cheese (hereinafter referred to as Cheese), and Nonfat Dry Milk Solids (hereinafter referred to as Milk) under the present program to support prices of manufacturing milk to producers and to resell these commodities to their offerers at CCC domestic sales prices in effect during April. For this purpose certain requirements of the present price support purchase programs for these commodities are being changed.

Purchases made under this Announcement Da–112 will be limited to commodities which the offerer agrees to repurchase from CCC as hereinafter provided. In addition, purchases of butter, cheese and nonfat dry milk solids during March 1954 will continue to be made under Announcements Da–99, Da–100, Da–101, and Da–102, amended only to change inspection, grading, and delivery requirements.

Further details with respect to this program may be obtained by communicating with W. A. James, Washington 25, D. C., telephone, REpublic 7–4142, extension 2292. Details with respect to individual purchases and sales may be obtained by communicating with the CSS Commodity Offices serving the area in which the commodities are located.

How to Submit an Offer

Offers may be submitted so as to be received daily through close of business March 31, 1954, by letter or telegram to the CSS Commodity Office serving the area in which the product is located (see attached Form CCC–85, except that States listed as being served by the Chicago CSS Commodity Office will be served by the Cincinnati, Ohio, CSS Commodity Office, 1010 Broadway, Cincinnati 2, Ohio, telephone: Dunbar 2200). Offers received each day, if in accordance with the terms of this announcement, will be subject to acceptance by the CCC by telegram filed at the respective CSS Commodity Offices not later than the second business day following the receipt of the offer but in no event later than March 31, 1954.

No amendment will be considered if received after the date of receipt of the offer unless (a) it is shown to the satisfaction of the CCC that such amendment was delayed in transmission by mail or telegraph through no fault of the offerer or (b) the amendment is made for the purpose of correcting an error apparent

on the original offer or is made at the request of the CCC for clarifying an ambiguity or supplying an omission in the offer. Offerers are cautioned to read this announcement and all supporting forms carefully and to verify all conditions, including prices, of the offer before its execution and submission. CCC reserves the right to accept or reject any or all offers in whole or in part or to waive any informality therein.

All envelopes containing offers must carry the following notation in the lower left corner of the envelope: "Offer under Announcement Da–112." All offers must state the following:

a. That the offer is made subject to the terms of this Announcement Da–112.

b. Commodity being offered and grade.

c. Quantity in pounds for each carlot being offered, and number of carlots.

d. Number and description of containers per car and, if milk, type of process, or if cheese, style of cheese. (Only one process of milk and only one style of cheese per car will be accepted. Moreover, all containers in any one carlot must be of the same type and size.)

e. If the commodity offered is cheese, that the cheese is offered on the standard moisture basis.

f. The location (address) of the product at the time of grading and where the product is to be held for CCC.

g. Price at which butter is offered (see paragraph 8 "PRICE"). The price at which cheese and milk are offered for sale to the CCC subject to the terms of this Announcement Da–112 need not be stated in the offer since the price to be paid by CCC is the announced 1953–54 purchase price and is stated in paragraph 8 "PRICE."

h. An offer to repurchase the commodity from CCC on April 1 or on the date the commodity is delivered to CCC, whichever is later, at the CCC domestic sales price for the commodity concerned in effect on April 1 or on the date of delivery to CCC, whichever is later.

## Terms and Conditions

1. *General*: In submitting an offer to sell the terms and conditions of this announcement and those set forth in UNIFORM CONTRACTUAL PROVISIONS (PMA–100, as revised 7–3–53) except Articles 3, 6, 8, 9, 11, 12, 17, 18, 19, 20, 21, 22, 23, and 35 thereof shall become a part of the offer to sell and upon acceptance by the CCC the offer and acceptance shall constitute a valid and binding contract.

2. *Quantity*: Offers may be for any quantity in multiples of not less than tariff minimum carlots for the area in which the commodities are located and only commodities which grade in accordance with the paragraph concerning quality, which follows, can be used to make up such carlot quantities.

3. *Tolerance*: A five percent tolerance will be permitted in delivery of the total contracted quantity but the allowance of such a tolerance shall not authorize the delivery of less than minimum carlots as defined above. No amendment to the contract will be granted to provide for the delivery of commodities in excess of the contract quantity plus the allowed five percent tolerance. Moreover, after March 31 offerers will not be permitted or required to substitute for commodities which do not meet quality requirements, and the contracted quantity shall be reduced without liability to either party, by the amount of the commodity which does not meet quality requirements.

4. *Quality and Weight*: All commodities offered hereunder shall meet all applicable provisions of the Federal Food, Drug and Cosmetic Act.

*Butter*: All of the butter offered shall be solid pack salted creamery butter which shall meet the requirements for the grade or grades, as offered, which grades shall be U. S. Grade A or higher or U. S. Grade B. Butter grading below U. S. Grade B will not be accepted. The contractor in submitting his offer warrants that none of the butter offered was produced prior to January 1953 nor later

than March 31, 1954. Grades and weights of butter shall be evidenced by certificates issued by the USDA not more than 30 days prior to the date of the offer nor later than March 31, 1954.

*Cheese*: All of the cheese delivered shall be American Cheddar Cheese (Cheddars, Twins, Flats or Rindless Block), and shall grade not lower than U. S. Grade A, and its grade and weight shall be evidenced by grading and weight certificates issued by the USDA not more than 45 days prior to the date of the offer.

*Roller Process and/or Spray Process Nonfat Dry Milk Solids*: All of the milk offered shall be bulk packed and shall meet the requirements for U. S. Extra Grade, except that the maximum percent of moisture shall not exceed 3.5 percent, and the grade and weight of the milk shall be evidenced by certificates issued by the USDA not more than 45 days prior to the date of the offer.

5. *Inspection and Sampling*: The commodity must be located in storage suitable to CCC, including storage at offerer's plant or warehouse. The offerer shall make available to USDA inspectors samples required for inspection as well as necessary assistance during the inspection without cost to CCC. All inspection fees and charges covering the product will be for the account of the offerer. Inspectors are not authorized to prescribe any change in the contract or to order the contractor to perform under the contract in any manner, and are not authorized to accept or reject a commodity. The offerer shall furnish the inspector with a manifest listing the date of manufacture, the name and location of manufacturing plant, churn, vat or lot number, number of packages in each churn, vat, or lot, and total packages in each carlot.

*Butter*: All butter shall be inspected and graded at the location where it is to be delivered to CCC not later than March 31, and the certificate issued shall be dated not later than March 31.

*Milk*: All milk shall be sampled at the location where it is to be delivered

to CCC not later than March 31 and the dry milk sampler's report issued shall be dated not later than March 31. This dry milk sampler's report date shall be listed on the certificate issued by USDA.

*Cheese*: All cheese shall be inspected and graded at the location where it is to be delivered to CCC and shall be graded not later than April 30, and the certificate shall show dates of manufacture not later than March 31. No cheese manufactured after March 31 shall be inspected and graded for offering under the terms of this announcement.

6. *Packaging*: Butter and nonfat dry milk solids offered under the terms of this announcement shall be packed to meet requirements of current price support announcements Da–99, Da–101, and Da–102; however, cheddar cheese may be packed in any type packaging which protects the commodity in accordance with good commercial practice, provided, however, it must be packed in such a way as to make it feasible to re-package into containers meeting the requirements of CCC's price support purchase announcement Da–100. Only one type and size of package will be acceptable per offered carlot.

7. *Markings*:

*Butter*: Each package shall be clearly stenciled or stamped with the name of the product, the marked weight and the churn number.

*Cheese*: Each cheese shall be clearly marked with the factory number or name and address of manufacturer, the date of manufacture and vat number.

*Milk*: All shipping containers shall be clearly marked with the name of the product, the name of the offerer and the location of the plant where the milk was manufactured, the month and year of manufacture, and the lot number.

8. *Price*: The price to be paid by CCC for commodities offered under the terms of this announcement shall be as follows:

*Butter*: The price to be paid for butter offered located at New York, in-

cluding Jersey City, N. J.; Chicago; San Francisco or Seattle will be the base price announced for each of these designated markets, which are as follows:

| Location | U. S. Grade A | U. S. Grade B |
|---|---|---|
| New York | 66.50 | 64.50 |
| Chicago | 65.75 | 63.75 |
| San Francisco | 66.75 | 64.75 |
| Seattle | 66.75 | 64.75 |

The price to be paid at other delivery points in the United States will be the applicable base price of the designated market named by the offerer less 80 percent of the lowest published domestic carlot freight rate (transportation tax excluded) per pound gross weight from the location of the butter to such designated market.

*Cheese*: The price to be paid for cheese offered under the terms of this announcement will be 37.0 cents per pound (the current purchase price for standard moisture cheese). Cheese offered under the terms of this announcement shall be repurchased by the offerer on the standard moisture basis.

*Milk*: The price to be paid for milk offered under the terms of this announcement shall be 16 cents per pound for spray process nonfat dry milk solids and 14 cents per pound for roller process nonfat dry milk solids.

9. *Delivery*:

*Butter*: Butter offered under the terms of this announcement must have been graded before offered and must have been graded not later than March 31, 1954. Delivery to CCC and transfer of title shall be effected at the location at which it is graded, and at the time the offer is accepted subject to quality requirements set forth herein as later evidenced by certificates issued by USDA.

*Cheese*: Cheese offered under this announcement must be in existence, dated, and owned or under consignment to offerer not later than March 31, 1954. Delivery to CCC and transfer of title shall be effected at the location at which it is graded and at the time it is graded or when offer is accepted, whichever is later, subject to its meeting the quality requirements set forth herein, as later evidenced by certificates issued by USDA which may be dated after March 31, but not later than April 30, 1954.

*Milk*: Milk offered under the terms of this announcement must have been sampled not later than March 31. Delivery to CCC and transfer of title shall be effected at the location at which it is sampled, at the time it is sampled or when offer is accepted, whichever is later, subject to its meeting the quality requirements set forth herein, as later evidenced by certificates issued by USDA which may be dated after March 31, but not later than April 30.

The offerer, at his expense, shall hold for CCC at the location at which it is graded or sampled in case of milk, and delivered, the commodity which he has delivered to CCC from the time of delivery until CCC redelivers the commodity to the offerer. Failure of the offerer to hold the commodity for CCC until its redelivery to the offerer shall render the contract void.

10. *Repurchase By the Offerer*: The offerer by submitting an offer to repurchase (see Item h, "HOW TO SUBMIT AN OFFER") agrees that on April 1 for butter and on April 1 or on the date on which delivery to CCC is effected, whichever is later, for cheese and milk to repurchase the commodity sold by offerer to CCC under terms of this contract at the CCC domestic sales price effective on such date of repurchase regardless of the quality or condition of the commodity, it being agreed for the purpose of this offer to repurchase that the commodity will on the date of such repurchase be of

the same grade and quality as when sold by offerer to CCC.

*Provided, however*:

That if the CCC domestic sales price in effect on the date of redelivery to the offerer is greater than the March 31 CCC price support purchase price for the commodity concerned CCC will, at the offerer's request amend his contract to relieve him of liability to repurchase the commodity and to provide for its sale to CCC under the terms of Announcements Da-99, 100, 101, and 102, as amended.

*Provided further*:

That if the CCC domestic sales price in effect on the date of redelivery to the offerer is greater than the March 31 CCC price support purchase price for the commodity concerned, CCC will, at the offerer's request, render his contract void.

11. *Delivery By CCC Upon Resale To Offerer*: Delivery by CCC to offerer shall be effected on April 1 or on the date on which the commodity is delivered to CCC, whichever is later. Delivery of the commodity to CCC in accordance with the paragraph entitled "DELIVERY" above shall effect redelivery by CCC to the offerer on April 1 or on the date CCC takes delivery, whichever is later.

12. *Location of Commodities*: Commodities offered for sale under the terms of this announcement shall remain in the place and in the form in which they are sampled or graded from the time of the sampling or grading until they are delivered to CCC and finally until title revests in the offerer.

13. *Storage*: Commodities sold to CCC under the terms of this announcement for resale to the offerer shall be stored by the offerer in such a manner as will protect them from deterioration and shall be handled in accordance with good commercial practice. Any storage, handling or transportation charges connected with the sale of the commodities to CCC or with their resale to the offerer or with their care and protection during the term of a contract under this announcement shall be for the account of the offerer. The offerer by submitting an offer agrees to act as insurer to CCC of the commodities and their quality while title to commodity is in CCC and offerer shall assume all risk of loss.

14. *Settlement*: Settlement for commodities purchased and resold under the terms of this announcement shall be made after redelivery to offerer on the basis of vouchers or certified invoices submitted by the offerer in each case claiming the net difference between the sales price to CCC and the sales price from CCC to offerer. Vouchers or invoices shall contain the statement "The commodity remained in the place in which it was sampled or graded from the time of sampling or grading until repurchased and redelivered to the offerer," and shall be supported by USDA grading and inspection certificates. Settlement will be made on the basis of the nearest even net pound.

/s/ Don S. Anderson

Don S. Anderson
Acting Director, Livestock and Dairy Division

On March 25, 1954, the Department of Agriculture issued "Amendment to Announcement Da-112" to provide that all cheese delivered should be packed as standard commercial styles, no piece of cheese to weigh less than ten pounds net. This permitted the offering of cheese in sizes smaller than Cheddars, twins, flats, and rindless blocks, the larger sizes which had theretofore been the only acceptable sizes.

The transactions under Da-112 were in the form of a combination offer, made between March 9 and March 31, 1954, to sell cheese or butter to CCC at the established 1953-1954 support price of 37¢ per pound for cheese, and to repurchase the identical cheese or butter at the lower 1954-1955 CCC sales prices for cheese and butter, which had been announced on April 1, 1954; that is, 34¼¢ per pound for cheese, and 57½¢ per pound for butter. The acceptance by CCC had to be made not later than March 31, 1954. Eligible butter must have been made not earlier than January 1, 1953, and had to be in existence and to have been inspected

by the Department of Agriculture's inspectors at or before the offer in March 1954. Delivery and passage of title was contingent on meeting the inspectors' tests. Cheese might be eligible even if not in existence at the time of the offer and its acceptance in March. If in existence it might be of any age. Some cheese offered was manufactured in 1952. If not in existence it had to be manufactured not later than March 31, 1954.

All offers were required to state the amount, location and description of the commodity offered. Offers which met the requirements of Da–112 were to be accepted by CCC within 2 days after receipt, but in no event later than March 31, 1954. The grades, weights, sizes and minimum quantity requirements for commodities offered under Da–112 were the same as those specified in the Standard Purchase Announcements, as were the inspection procedures, and packaging requirements for butter and nonfat dry milk solids. The requirements with respect to cheese were changed to permit inspection after March 31, but prior to May 1, 1954, and to allow Cheddar cheese to be packaged "in any type packaging which protects the commodity in accordance with good commercial practice." The change in packaging requirements saved offerers about 1¢ per pound.

Da–112 provided that delivery to CCC and transfer of title should be effected at the time which, and at the place where, the cheese or butter was inspected. In the case of *butter*, the time of "delivery and passage of title" to CCC was stated to be the date of acceptance of the offer (not later than March 31, 1954) subject to its meeting the quality requirements.

In the case of cheese, the time of "delivery and passage of title" to CCC was stated to be the date of the acceptance of the offer, which had to be in March 1954, or the date on which the cheese was inspected which might be in March, or as late as April 30th, whichever was the later. Paragraph 11 provided that delivery by CCC to plaintiffs shall be effected on April 1, 1954, or on the date on which the commodity is delivered to

CCC, whichever is later. Delivery of the commodity to CCC in accordance with this paragraph shall effect redelivery by CCC to the plaintiffs on April 1, or on the date CCC takes delivery, whichever is later. In the case of cheese inspected on or after April 1, 1954, the delivery and passage of title to CCC and the redelivery and passage of title to plaintiffs occurred at the same instant in April.

The risk of loss was on the plaintiffs from the time of their offer until "redelivery" to them. Storage, carrying and handling charges were charged to their account. The plaintiffs had certain options to modify or to vacate the contract. It provided that if the CCC domestic sales price for cheese or butter effective April 1, 1954, should be greater than the March 31 CCC price support purchase price, the contract with CCC might at the plaintiffs' option, (a) be amended into a contract to sell to CCC under the normal 1953–1954 program, free from any obligation to rebuy, or, (b) be declared wholly void. The reason for the inclusion of these options was the pendency in Congress of several bills to set aside the Secretary's reduction of the support level from 90% to 75% of parity, or to require him to establish support of 100% of parity. Enactment of any of these bills would have caused an upward revision of CCC's April sales prices which would have eliminated the opportunity afforded an offerer by Da–112 to sell to CCC at one price, that is, 37¢ for cheese, and simultaneously agree to buy back the same goods at a lower price of 34¼¢ for cheese.

Da–112 also provided that the offerer's right to receive payment was contingent upon his holding the cheese or butter in place, and not selling it to anyone except CCC until April 1, 1954, or the date of inspection, whichever was later. It was provided that the offerer's failure to retain the goods for that period "shall render the contract void". After "redelivery" to the plaintiffs and submission to CCC of the inspection certificates as to grade and other requirements, together with vouchers or certified invoices.

for the difference between their sale price to CCC and its resale price to plaintiffs, payment for the difference on each pound of cheese and butter covered by the transactions was paid to plaintiffs by CCC.

The procedure under Da–112 was a wide departure from the normal program followed by CCC since the enactment of the Act. Paragraph 23 of the "Uniform Contractural Provisions" imposing liability for breach of contract was omitted from Da–112. Paragraph 9 of Da–112 provided that the contract with CCC shall be "rendered void" if the offerer fails to keep the goods in his possession until redelivery by CCC.

The plaintiffs could repudiate the contract at any time without liability to CCC. In fact, a repudiation would have resulted in a gain to CCC.

Under the agreement it was never intended that CCC should obtain possession of the cheese and butter, and it never did get possession. The goods never moved from plaintiffs' possession and custody. CCC was obligated to resell to plaintiffs what plaintiffs sold to CCC. The alleged transfer of title to CCC and retransfer to plaintiffs was simultaneous in most transactions.

The risk of loss at all times remained with the plaintiffs. Plaintiffs could sell the same cheese and butter sold to CCC, to anyone, as they saw fit, without liability for breach of its contract, notwithstanding its "sale" by them to CCC. They retained possession of the property with the right to sell the cheese and butter to others, or make any disposition of it without any liability to CCC.

The agreement provided for payment to plaintiffs by CCC of the difference between the purchase and resale price with nothing moving to CCC save the inspection reports and the certified vouchers.

The plaintiffs had the right to repudiate their contracts, if, on April 1, or the date of inspection, CCC's sale prices were greater than the 1953–1954 support prices. They would have been greater if Congress enacted the bills which called for a restoration of the 90% parity level,

or for raising the level to 100% of parity. The offer was not finally committed until April 1, or the date of inspection, whichever was latest, and the contract to sell was conditioned until then.

1. Under the prior programs the goods sold to CCC had to be in existence and ready for delivery and inspection and graded prior to their offering, and grading certificates had to accompany the offer. None of these requirements applied to Da–112.

2. Under those programs the offers were final and unqualified. Offers under Da–112 were definitely limited to goods which plaintiffs agreed to repurchase.

3. Under the former programs, offerers had to furnish a performance bond and were liable in damages for nonperformance. These provisions were omitted from Da–112.

The prior programs provided for delivery to CCC within 14 days of acceptance of the offer to sell to it and normally delivery was effected within that time. No delivery to CCC ever occurred under Da–112.

Offers of rindless block cheese under Da–100 had to guarantee it for 90 days against mold development under the wrapper. This requirement was omitted from Da–112.

Manufacturing plants that supply cheese for delivery under Da–100 were subject to inspection by the Department of Agriculture and cheese made in a plant found to be operating under unsatisfactory sanitary conditions was not eligible. These provisions were omitted from Da–112.

Under Da–100 cheese had to be packaged in new boxes meeting elaborate agriculture specifications. This was not required by the March 25 amendment to Da–112.

Under Da–112 the delivery and redelivery are wholly unrealistic and fictitious. It was as the defendant contends nothing but a "paper transaction", which ended with the Government owing plaintiffs 2¾¢ a pound on all cheese, and 3¢ a pound on all butter on which they had submitted invoices to CCC.

Enormous quantities of aged cheese worth more than 37¢ in March 1954 were included in the Da–112 transactions because the offerer knew he would retain possession of it and that the cheese would never leave the offerer's inventory.

Over 50% of all Da–112 transactions involved April inspections.

Sec. 11 of Da–112 provided that "delivery of the commodity to CCC shall effect redelivery by CCC to the plaintiffs on April 1, or the date CCC takes delivery, whichever is later". CCC never had the right to sell or dispose of the products except to plaintiffs.

The plaintiffs were free to sell the commodity to anyone. They could sell to others in March for delivery in April under Da–112. They could sell in March for delivery in March or before inspection of the cheese in April, without penalty other than rendering their Da–112 contract void.

There is no evidence that the purchase and resale at a loss program did achieve the main objective of the price support program, that is, the support of prices paid to farmers for their milk and butterfat.

Affording inventory protection to plaintiffs was not an objective of the milk support program, and was never so intended by Congress.

Plaintiffs contend they could have sold their products under Da–100 and repurchased under 107 instead of selling and repurchasing under Da–112 and attain the same results.

The Da–112 program permitted plaintiffs to simultaneously sell and repurchase all of its cheese, green and aged alike, without any risk that they might not obtain the return of the identical cheese. It permitted them to obtain 2¾¢ per pound payment to reduce their inventory costs, without the risk of losing their aged cheese involved in the transactions under Da–112, in which they were assured that the cheese sold would not leave their possession. There was no risk or gamble involved, as to whether the identical cheese sold could be repurchased.

Cheese offered under Da–100 required the repacking and reboxing at a cost of approximately 1¢ a pound. The net receipts on a Da–100 transaction similar to one under Da–112 would be 1¾¢ instead of 2¾¢ a pound.

Under a Da–100 transaction an actual sale was made to CCC. The merchandise was delivered into the custody of CCC and payment made by CCC after inspection and grading, which took approximately 3 weeks from date of delivery.

Small style cheese were involved in the Da–112 program and in the permanent program after April 1, 1954. They were not included in the regular Da–100 program during the remainder of the marketing year ending March 31, 1954. The small style cheese had not been included in purchases before the announcement on March 25, 1954. The inclusion of small styles on the general program was within the discretion of the Secretary of Agriculture. They were included in the program to give their owners the same inventory protection which had been given to owners of large styles.

Plaintiffs contend that the transactions under Da–112 possessed all of the essential requirements of a "purchase"; that the Secretary of Agriculture was by Sec. 1446 of the Act vested with a wide discretion, and that his determinations were final as to any transaction which accomplished the purpose of the purchase methods of price support of dairy products under the Statute.

Sec. 1429 provides "Determinations made by the Secretary under this Act shall be final and conclusive." Those determinations referred to are those made by the Secretary with respect to matters left to his judgment, such as a choice between "loans" and "purchases". He had no discretion to substitute payments for purchases or engage in "other operations" not authorized by Sec. 1446.

The offers by plaintiffs could be made any time between March 9, 1954, when Da–112 was published, and March 31, 1954. Most offers were made by plaintiffs in the latter part of March, and there was no effectual removal from the

market of the goods covered by the Da–112 transactions. Plaintiffs retained every right of ownership to sell or dispose of the commodities as it desired, without answering to CCC.

■ Words in a contract or a Statute are to be given their ordinary meaning in the absence of controlling considerations to the contrary. Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311; Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035.

■ A sale is defined in Section 1 of the Uniform Sales Act as follows: "A sale of goods in an agreement whereby the seller transfers the property in goods to the buyer for a consideration called price." Nothing in the legislative history indicates that the word "purchase" was used by Congress otherwise than according to its normal meaning.

■ The word purchase in Sec. 1446(c) means acquisition by the Government for a consideration, of full title and the right to ownership and possession of products purchased. The transactions under Da–112 were not purchases as used in said section, or as normally used in commercial practice, for the reasons that possession and control of the cheese and butter never moved to the defendant, and CCC never had the right such as a buyer and owner under a sale and purchase contract normally has; the goods remained in plaintiff's possession, was continuously carried by them in their inventories; they were free to dispose of it, to sell and give title to any other purchaser, without liability to CCC. In numerous instances the so-called transfer of title to CCC and re-transfer to plaintiffs was instantaneous. The risk of loss at all times remained in the plaintiffs. In a mormal sale it would move with the transfer of title to the buyer. Plaintiffs had the option to withdraw from their contracts if CCC's sales prices on April 1, 1954, were greater than its sales prices previously announced and in effect on April 1, 1954, therefore, the transactions were nothing more than conditional until April 1, 1954. Full right of ownership, possession, and control at no time vested in CCC. It was committed to sell to plaintiffs and no one else. The right to sell property to whoever the owner sees fit is an incident of ownership. Congress intended that the goods purchased by CCC would be more or less removed from the commercial market. The basic theory of the "purchase" method is removal from the market of goods which cannot be sold in the commercial market at CCC's purchase price, and there was no such removal in these transactions.

The transactions between plaintiffs and CCC, and all payments made by CCC to plaintiffs pursuant to the said transactions under the Da–112 announcement were illegal and not authorized by the Statutes. The defendant is entitled to judgment on its counterclaim, dismissing plaintiffs' complaints, and to a recovery from plaintiffs of the amounts paid to them under said transactions as follows:

| | | |
|---|---|---|
| (a) Kraft Foods Company of Wisconsin | | $404,547.55 |
| (b) The Borden Company | | $314,817.94 |
| (c) The Cudahy Packing Company | | $ 27,687.61 |
| (d) Armour and Company | | $ 25,490.37 |
| (e) C. J. Berst & Co. | | $141,402.90 |
| (f) Safeway Stores, Incorporated | | $ 81,227.89 |
| (g) H. J. Heinz Company | | $ 24,865.77 |
| (h) L. D. Schreiber & Co., Inc. | | $ 42,052.24 |

with interest thereon from the date repayment was demanded, which was May 8, 1956, with its costs and disbursements.

Let judgment be entered accordingly.

## On Plaintiffs' Motion to Amend Judgments

Plaintiffs filed their motion under Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to amend the judgment orders heretofore entered, so as to delete therefrom the provisions for the payment of interest after May 8, 1956, the date when defendants demanded payment.

The motion was submitted on briefs of the parties, which have been carefully considered by the Court.

On June 20, 1958, this Court entered judgments in these actions on defendant's counterclaim in favor of defendant and against the plaintiffs, awarding to defendant the sums in controversy, together with interest from May 8, 1956, the date on which the Department of Justice, acting on behalf of the Commodity Credit Corporation, had demanded payment of such sums.

Plaintiffs assert that consideration of practical fairness and justice required that it be relieved of the judgments entered herein insofar as those judgments require them to pay interest on the sums in controversy prior to the date of the judgments, inasmuch as all parties acted in good faith in carrying out the Da–112 transactions; that the allowance of interest prior to the date of judgment would be grossly inequitable under the facts and circumstances established by the proofs in these actions. In addition, plaintiffs rely on the opinion of the Court of Appeals for the Fourth Circuit in Swift & Co. v. United States, 257 F.2d 787, in which a similar question of the allowance of interest was before that Court. The Court there held that in view of the facts in that case (which were practically identical to those in these cases), it would be inequitable to add interest prior to the date when the judgments were entered.

 Formal demand on plaintiffs for payment was made by the Department of Justice on behalf of the Commodity Credit Corporation less than two years after the transactions were con-summated. These and similar actions were commenced shortly thereafter. There never was any dispute as to the amounts of the payments involved in these actions. It was conceded by the defendant that all parties acted in good faith in the Da–112 transactions. However, one is inclined to inquire who, in these transactions, represented "the real party in interest", the United States taxpayer whose contributions to the United States Treasury supplied the funds distributed to the plaintiffs by the Commodity Credit Corporation. For four years the Government was deprived of the use of the amounts involved herein, while the plaintiffs enjoyed its use without charge. The Court may take judicial notice of the fact that during this period the Government was a borrower with interest. The cheese and butter never left the plaintiffs' possession. It at all times remained in their inventories. The alleged transfers of title were fictitious and imaginary. The equities in these cases all lie on the side of the Government, and ordinary justice requires that the Government be made whole insofar as possible by the judgment of this Court. The allowance of interest to the Government for two of the four years during which plaintiffs had use of the money involved seems fair and just to this Court.

There was no unreasonable delay by the Government in prosecuting its claim against plaintiffs. In the absence of unreasonable delay, or some other exceptional circumstance, the Government should not be deprived of that which it is justly entitled to, which in these cases includes the interest provided for in the judgment entered herein.

Allowance of interest to the Government from the date when payment was demanded, in actions to recapture overpayments, has been frequently allowed regardless of whether such payments were received in good faith, all based upon the view that one who has been unjustly enriched at the expense of another, and had use of money owing to another, should in justice make compensation for

its wrongful detention. Restatement Restitution Sec. 156.

It has been held in numerous cases that parties receiving moneys wrongfully, erroneously, or illegally paid by a Government officer, are liable in justice and good dealing to refund them. Wisconsin Central R. Co. v. United States, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399. United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932. The same rule of law and reasoning applies equally to the Government's claim for interest on sums illegally paid by a Government agency.

There were no exceptional circumstances in these cases which would justify the disallowance of interest from the date payment was demanded by the Government. Practical justice requires that the Government be made whole by the repayment of the amounts involved herein with interest as directed. Therefore, plaintiffs' motion to amend the judgments herein is denied.